[Civ. No. 55309. Second Dist., Div. Three. Oct. 11, 1979.]

DONALD R. McCONVILLE, Plaintiff and Respondent, v.
DORIS V. ALEXIS, as Director, etc., Defendant and Appellant.

594

**COUNSEL**

George Deukmejian, Attorney General, Marilyn K. Mayer and John Crimmins, Deputy Attorneys General, for Defendant and Appellant.

John Chemeleski for Plaintiff and Respondent.

**OPINION**

**KLEIN, P. J.—**

### STATEMENT OF THE CASE

This is an appeal by the Director of the Department of Motor Vehicles (hereinafter DMV) from a judgment of the superior court in administrative mandamus setting aside a decision of DMV to revoke, for a period of six months, the driver's license of Donald McConville (McConville). The license revocation was based on McConville's asserted failure to comply with the provisions of Vehicle Code section 13353, which creates, on the part of drivers suspected of being intoxicated, an implied consent to a chemical test of either their blood, breath, or urine.[1]

---

[1]Subdivision (b) of Vehicle Code section 13353 provides: "If any such person refuses the officer's request to submit to, or fails to complete, a chemical test, the department [of Motor Vehicles], upon receipt of the officer's sworn statement that he had reasonable cause to believe such person had been driving a motor vehicle upon a highway while under the influence of intoxicating liquor and that the person had refused to submit to, or failed to complete, the test after being requested by the officer, shall suspend his privilege to operate a motor vehicle for a period of six months. . . ."

At the administrative hearing held to determine McConville's compliance with the implied consent statute, the arresting officer, Charles Smith of the Highway Patrol, testified as follows:

On March 18, 1977, at approximately 12:30 a.m., Officer Smith observed McConville driving westbound on the Ventura freeway at an excessive rate of speed; McConville was also weaving from lane to lane. Officer Smith turned on his red stop light, causing McConville to pull over. When McConville exited his vehicle, Officer Smith observed that his face was flushed, that he used slurred speech, that he emitted a strong odor of alcohol, and that he was unsteady on his feet. Officer Smith formed an opinion that McConville was intoxicated, which opinion was confirmed when McConville flunked several field sobriety tests.

McConville thereupon was placed under arrest for driving under the influence of alcohol (Veh. Code, § 23102, subd. (a)). While McConville was being transported to the Van Nuys police station, Officer Smith informed him of the chemical test requirement and explained each of the three possible tests. McConville, however, refused to select one of the tests until after his arrival at the police station, at which time he chose the urine test. Officer Smith had warned McConville beforehand that the urine test was the most difficult of the three in that he would be expected to first void his bladder and then provide, twenty minutes later, a sample large enough to be analyzed. McConville was also told that if he was unable to do this, he would have to take one of the two remaining tests.

McConville completed the first part of the test by voiding his bladder. But when it came time for him to provide the test sample 20 minutes later, he was in an uncooperative mood. Officer Smith thereupon read to McConville from a form which summarized the applicable provisions of Vehicle Code section 13353.[2]

After some quarrelsome discussion, McConville indicated that he was prepared to complete the urine test. But when he was taken to the urinal

---

[2]The form statement read to McConville was as follows: "You are required by state law to submit to a chemical test to determine the alcoholic content of your blood. You have a choice of whether the test is to be of your blood, breath or urine. If you refuse to submit to a test or fail to complete a test your driving privilege will be suspended for a period of six months. You do not have the right to talk to an attorney or to have an attorney present before stating whether you will submit to a test, before deciding which test to take, or during the administration of the test chosen. If you are incapable, or state you are incapable, of completing the test you choose, you must submit to and complete any of the remaining tests or test."

and handed the sample bottle, he stated, "Well, I can't go now." Officer Smith then informed McConville that he would have to take one of the other two tests. When McConville replied, "No. I don't want to take a test," Smith deemed McConville's attempt at completion of the test over.

McConville's testimony at the administrative hearing was inharmonious with Officer Smith's in several respects. For example, McConville claimed that he had not, at the time of the first voiding, been told how soon after he would be expected to provide the test sample or whether, in fact, another sample would be required. He also asserted that he was never warned that his refusal to complete a test would result in a six-month suspension of his driver's license.

McConville further testified that there was only about a 10-minute interval between when he was first asked to void and when Officer Smith asked him to produce the test sample. He claimed that when he was not immediately able to produce the specimen, he asked for a few more minutes to complete the test. According to McConville, Officer Smith replied, "No. You'll have to complete it right now." Smith then told McConville that he had refused the test and escorted him from the restroom. McConville averred that had he been afforded a reasonable period of time within which to provide the sample he would have done so. McConville admitted, however, that Officer Smith had offered him either of the other two tests when he experienced difficulty completing the urine test. He also admitted having drunk about three 12-ounce beers between 6 and 11 p.m. on the evening in question.

In recommending suspension of McConville's license, the referee who presided over the administrative hearing found: (1) that Officer Smith "had reasonable cause to believe that Mr. McConville had been driving a motor vehicle upon the highway while under the influence of intoxicating liquor"; (2) that "McConville was lawfully arrested"; (3) that McConville was adequately warned concerning the consequences of either refusing or not completing a chemical test; and (4) that "McConville refused to submit to or failed to complete a test of his blood, breath or urine to determine the alcoholic content of his blood after being requested to do so . . . ."

The mandamus proceedings in the superior court were limited to a review of the administrative record and the verified pleadings of the parties. The court's decision to overturn DMV's revocation decision was based on a finding of fact that the "portion of . . . [DMV's] findings which state that . . . [McConville] refused to submit to or failed to

complete any chemical test of his blood, breath, or urine after being requested to do so by an officer, *is not supported by the weight of the evidence.*" (Italics added.)

## DISCUSSION

It would appear from the italicized portion of the superior court finding set out above that the court took it upon itself to reweigh the evidence from the administrative hearing and make independent findings. The initial question to be addressed here is whether this was proper.

The procedure for obtaining judicial relief from the decision of an administrative agency is set forth in Code of Civil Procedure section 1094.5. Subdivision (c) of that section establishes two possible standards of review by providing as follows: "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is *authorized by law to exercise its independent judgment* on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence; and in all other cases, abuse of discretion is established if the court determines that the findings are not supported by *substantial evidence in the light of the whole record.*" (Italics added.)

In *Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242], our Supreme Court held that if the decision of a statewide agency which is not constitutionally authorized to exercise judicial functions[3] will substantially affect a vested, fundamental right, then the reviewing trial court should, pursuant to subdivision (c) of Code of Civil Procedure section 1094.5, exercise its independent judgment on the evidence in a limited trial de novo. (*Id.,* at p. 143.) If, however, the agency's decision will not affect a fundamental vested right, then the court's review is limited to a consideration of whether the agency's findings are supported by substantial evidence and whether the agency committed any errors of law. (*Id.,* at p. 144.)

The court in *Bixby* went on to note that the determination of whether a particular administrative decision or class of decisions substantially affects fundamental vested rights would have to be made on a case by case basis. (*Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 144.) The Supreme

---

[3]The Department of Motor Vehicles is a statewide agency lacking constitutional power to perform judicial functions. (*James* v. *Dept. of Motor Vehicles* (1968) 267 Cal.App.2d 750, 752 [73 Cal.Rptr. 452].)

Court has made it clear, however, that "[w]hen an administrative decision affects a right which has been legitimately acquired or is otherwise 'vested,' and when that right is of a fundamental nature from the standpoint of its economic aspect or its 'effect . . . in human terms and the importance . . . to the individual in the life situation,' then a full and independent *judicial* review of that decision is indicated because '[t]he abrogation of the right is too important to the individual to relegate it to exclusive administrative extinction.' " (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 520 P.2d 29] (italics in original), quoting *Bixby* v. *Pierno, supra,* at p. 144.)

In deciding whether a six-month suspension of a driver's license constitutes a substantial interference with a vested fundamental right, we begin by noting that we do not write upon a clean slate. In the recent case of *McGue* v. *Sillas* (1978) 82 Cal.App.3d 799 [147 Cal.Rptr. 354], the First District Court of Appeal expressly rejected a contention that possession of a driver's license is a fundamental right under the *Bixby* formulation[4] and consequently held that administrative mandamus review of DMV license revocations is to be governed by the substantial evidence test rather than the independent judgment test. (*Id.,* at pp. 803-806.)[5] The court explained that it had reached this result because: "In weighing the relative importance to individuals in the life situation, we are of the opinion that the public's interest in strict enforcement of traffic laws designed to eliminate drunken driving far outweighs the right of an individual to drive. (Cf. *Mobil Oil Corp.* v. *Superior Court* (1976) 59 Cal.App.3d 293, 305 [130 Cal.Rptr. 814].) Enforcement of this rule does not effectively deny an individual transportation not even by private automobile. At most, it puts an economic burden on him by requiring that he use other means of transportation. The resulting expense and inconvenience are not sufficient to raise the right to drive to the stature of a fundamental right." (*Id.,* at p. 805, fn. omitted.)

---

[4]The *McGue* court did concede that a driver's license becomes a vested right once obtained. (*McGue* v. *Sillas, supra,* 82 Cal.App.3d 799, 804.)

[5]In so holding, the court in *McGue* broke with a line of cases, beginning with *James* v. *Dept. of Motor Vehicles, supra,* 267 Cal.App.2d 750, 752, which had found the independent judgment test to be the appropriate standard of review. (See also *Anderson* v. *Cozens* (1976) 60 Cal.App.3d 130, 138, fn. 4 [131 Cal.Rptr. 256]; *Packer* v. *Sillas* (1976) 57 Cal.App.3d 206, 217 [128 Cal.Rptr. 907]; *Goodman* v. *Orr* (1971) 19 Cal.App.3d 845, 848 [97 Cal.Rptr. 226].) We note in this regard, however, that *James* and its progeny should probably no longer be viewed as being directly on point since *James* preceded *Bixby* and therefore did not concern itself with the question of whether possession of a driver's license involves a fundamental right. Rather, relying on the case law then deemed applicable, the court in *James* found adequate reason to impose the higher standard of review in the fact that such possession clearly involves a vested right. (*James* v. *Dept. of Motor Vehicles, supra,* 267 Cal.App.2d at p. 752.)

We too share the concern shown by the court in *McGue* for the protection of the public from the havoc wreaked by drunk drivers. ■ This concern, however, cannot prevent us from recognizing that nothing in *Bixby* or its progeny indicates that the ascertainment of fundamental vested rights is to be accomplished by a process in which the interests of the individual claiming the right are to be weighed against any countervailing interests of the public.[6] Rather, the focus of the *Bixby* test is singularly on the importance of the claimed right to the individual seeking judicial review. (See *Strumsky* v. *San Diego County Employees Retirement Assn., supra,* 11 Cal.3d 28, 34, 45; *Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 144-147; see also *Thomas* v. *Department of Motor Vehicles* (1979) *ante,* pp. 12, 15-16, fn. 3 [158 Cal.Rptr. 506].)

■ In view of the foregoing, we must respectfully disagree with the conclusion reached by the court in *McGue* concerning the nature of the vested right at issue here. As we see it, there can be little question but that possession of a driver's license rises to the level of a fundamental right under *Bixby* in terms of both the economic implications relating thereto and "the importance of" the possession "to the individual in the life situation." (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 144.) This, of course, is most obviously true with respect to those individuals whose occupations depend directly on the ability to drive, such as truck drivers or delivery persons. But even for those for whom driving is merely a way to get to and from a place such as work or school, the loss of a driver's license for a six-month period can constitute a severe hardship.[7] For while we should all be encouraged by our current fuel shortages and pollution problems to

---

[6]We do not read *Mobil Oil Corp.* v. *Superior Court, supra,* 59 Cal.App.3d 293, cited in the passage from *McGue* quoted above, as authority for the use of a weighing test in the determination of fundamental vested rights. In *Mobil Oil,* the appellate court held that the substantial evidence test was the proper standard of review to be applied in a mandamus action challenging the decision of a county air pollution control district to require installation of vapor recovery systems in gasoline storage and loading operations. While the court did mention the public's right to breathe clean air as part of its response to a contention by the petitioning oil companies that they had a vested, fundamental right to release gasoline vapors into the atmosphere, it appears from the court's opinion that the decision to reject any such contention was based primarily on the fact that the oil companies were asserting, at most, a purely economic interest which could in no manner be deemed of great importance in the life situation. (*Id.,* at p. 305.)

[7]It might be noted that in *Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586], the United States Supreme Court remarked, at page 539 [29 L.Ed.2d at p. 94], that "[o]nce [driver's] licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees." (But see *Mackey* v. *Montrym* (1979) 443 U.S. 1 [61 L.Ed.2d 321, 99 S.Ct. 2612], holding that due process does not demand that suspension of a driver's license for failure to take a chemical test be preceded by a hearing.)

seek alternatives to the private automobile, it is nevertheless patent that the public transportation systems available at this point in time do not meet the needs of many commuters and that other forms of transportation, such as taxi cabs, are not economically feasible for a large proportion of the population.

Having thus concluded that the trial court in the present case properly employed the independent judgment test in reviewing the decision of DMV to revoke McConville's driver's license, we are left with the task of determining if there is substantial evidence in the administrative record to support the court's judgment overturning that revocation. (*Harmon* v. *Board of Retirement* (1976) 62 Cal.App.3d 689, 691-692 [133 Cal.Rptr. 154]; *Rigsby* v. *Civil Service Com.* (1974) 39 Cal.App.3d 696, 701 [115 Cal.Rptr. 490].) We note initially in this regard that the trial court apparently found itself in agreement with the administrative referee's determinations that there was probable cause to arrest McConville, that he was in fact lawfully arrested, and, finally, that he was adequately warned concerning the consequences of not complying with the implied consent law. Indeed, the only adverse finding made by the court concerned the question of whether McConville had either refused to submit to or failed to complete a chemical test.

 In analyzing the validity of this adverse finding, we begin with the basic proposition that compliance with the provisions of the implied consent statute requires that the arrestee complete, not merely attempt, one of the three possible tests. (*Skinner* v. *Sillas* (1976) 58 Cal.App.3d 591, 598 [130 Cal.Rptr. 91]; *Cahall* v. *Department of Motor Vehicles* (1971) 16 Cal.App.3d 491, 496 [94 Cal.Rptr. 182].) Furthermore, it is beyond dispute that successful completion of McConville's urine test in the case at bench would have required that he urinate a second time. (*Cahall, supra,* at pp. 495-496.) Under the provisions of the statute, an arrestee who is incapable of completing the test he has chosen must select one of the other two in order to avert the loss of his driver's license. (*Smith* v. *Cozens* (1972) 25 Cal.App.3d 300, 303 [101 Cal.Rptr. 787]; *Cahall, supra,* at p. 496.)

Given this well established case law, it would seem that the only subject open to contention concerns whether Officer Smith acted arbitrarily or unreasonably in determining how much time to allow for completion of McConville's urine test. The officer's testimony in this regard was that he generally determined the maximum amount of time he would allow an arrestee to complete a urine test by the amount of time

it took him (Officer Smith) to fill out the necessary reports at the station house. Officer Smith testified that he had, with respect to the case at bench, completed all of his booking reports and was ready to leave at the time he asked McConville to produce the test sample. When asked what he believed was a reasonable period of time to allow a person to produce a urine sample after an initial voiding, Smith replied, "[M]ost people could give within twenty minutes if they really want to."

The issue to be addressed here arises by virtue of the fact that the administrative code provision which specifies the minimum 20-minute period between the time of the initial voiding and the taking of the test sample (Cal. Admin. Code, tit. 17, § 1219.2, subd. (a)) makes no mention of any maximum period which is to be allowed for the production of the sample.[8]

■ Appellate courts which have touched upon the subject, however, have made it clear that time is of the essence when it comes to the taking of one of the mandated tests. For example, in *Zidell v. Bright* (1968) 264 Cal.App.2d 867 [71 Cal.Rptr. 111], the appellate court stated at page 870: "The immediate purpose of Vehicle Code section 13353 . . . is to obtain the best evidence of blood alcohol content at the time of the arrest of a person reasonably believed to be driving while intoxicated. . . . [¶] . . . [The language of the statute] implies that the decision of the arresting officer whether to request a test, and the suspect's response thereto, should not be delayed." In *Skinner v. Sillas, supra,* 58 Cal.App.3d 591, 598-599, the court, quoting from *In re Newbern* (1959) 175 Cal.App.2d 862, 866 [1 Cal.Rptr. 80], explained the need to proceed quickly with a blood alcohol test in the following terms: " 'It is a matter of common knowledge that the intoxicating effect of alcohol diminishes with the passage of time. In a matter of a few hours an intoxicated person may "sober up." The efficacy of a blood test depends upon its being made as soon as possible after the time of the offense. To be of any probative value the test must be "near" to the offense in point of time. If it is not taken promptly after the arrest, it proves nothing.' " (Fn. omitted.)

The courts have also considered the role the arresting officer must play in the determination of how long an arrestee will be given to complete a chemical test or, more particularly, a urine test. The conclusion of the court in *Skinner* was as follows: "In most cases it will be the arresting

---

[8]The above cited California Administrative Code provision reads: "The only approved urine sample shall be a sample collected no sooner than twenty minutes after first voiding the bladder."

officer who will notify the suspect of the implied consent law and it will be the arresting officer who will either give the test or take the suspect to a facility where a test can be administered. Under such circumstances *it would be inconsistent with the purposes of the statute to require the officer to sit around and wait until the suspect believes he is ready to take the test.*" (*Skinner* v. *Sillas, supra,* 58 Cal.App.3d 591, 599, italics added.) In *Smith* v. *Cozens, supra,* 25 Cal.App.3d 300, 302, the appellant driver argued that " 'only the arbitrary time limit [one-half hour] imposed by the arresting officer prevented completion of the chosen test.' " Finding no merit in this argument, the appellate court stated: "Clearly implied in the statute is the requirement that one of its described tests be submitted to and completed expeditiously; otherwise the purpose of the law would be frustrated." (*Ibid.*)

Admittedly, we have not discovered any case from this state in which an arrestee was given as little time to complete a urine test as was allowed here, apparently about one to two minutes following the initial demand for the second (or test) sample. ▮ Nonetheless, the above cited authority compels us to conclude that DMV's determination of McConville's noncompliance with the implied consent law must be upheld, even when the evidence is viewed in the light most favorable to the contrary determination of the trial court.

First, it seems reasonably clear that McConville was given at least the required minimum 20 minutes between when he first voided and when he was asked to provide the test sample.[9] In addition, it is not disputed that at the time Smith asked for the sample, McConville clearly indicated that he was not then capable of producing it. If the law were such that the selection of a particular test meant that the arrestee had to complete that, and only that, test, then surely basic fairness would have required in the present case that some reasonable period of time be allotted McConville before his inability to urinate was declared a refusal. The implied consent law, however, makes no such demand. Rather, as noted previously, an arrestee who is incapable of completing a test he has chosen need only

---

[9]We recognize that McConville opined at the administrative hearing that only about 10 minutes passed between the time of the initial voiding and the time when he was returned to the urinal for the test sample. However, in the points and authorities he submitted in support of his petition for a writ of mandate, McConville took the position that Officer Smith's arrest report firmly established that the time interval was actually at least the minimum 20 minutes required by the regulation, a position McConville appears to have maintained on appeal. Moreover, there is nothing in the findings of the trial court which suggests that the court in any manner based its decision on a belief that the minimum time requirement of the regulation had been violated.

select and complete one of the other two tests in order to achieve compliance with the statute. McConville, of course, admitted at the administrative hearing that he had been offered, but refused, the chance to take either a blood or breath test when he experienced difficulty urinating.

We have lastly McConville's self-serving claim that he could have produced a test sample had he been granted a few extra minutes. Perhaps it would have taken him only a few minutes; on the other hand, what if, try as he might, it had actually taken him an hour or an hour and a half? As noted above, the accuracy of the test depends upon its being taken as close as possible to the time of the arrest.[10]

The judgment (order granting a peremptory writ of mandate) is reversed.

Allport, J., and Potter, J., concurred.

---

[10]We do not believe that McConville's case is aided by his allegation, first raised in his petition for writ of mandate, that Officer Smith remained at the police station for some 20 minutes after he determined that McConville had refused to complete the urine test. We do not quarrel with the fact that this allegation, if proved, would tend to contradict Officer Smith's testimony that he was ready to leave the station at the time he asked McConville to produce the test sample. That Officer Smith was perhaps in a position to stay a little while longer at the station does not, however, alter the fact that McConville refused to complete the test when he was requested to do so. It has been clearly held that once an arrestee has refused a test, there is no requirement that his request to complete the test a short time later be honored. (*Zidell* v. *Bright, supra,* 264 Cal.App.2d 867, 869-870.)