[L.A. No. 31345. Oct. 22, 1981.]

ERNESTO GONZALES HERNANDEZ, Plaintiff and Appellant, v. DEPARTMENT OF MOTOR VEHICLES, Defendant and Respondent.

COUNSEL

Owen P. Rafferty and Philip A. Rafferty for Plaintiff and Appellant.

George Deukmejian, Attorney General, and Martin H. Milas, Deputy Attorney General, for Defendant and Respondent.

OPINION

**TOBRINER, J.**—Since 1966, section 13353 of the Vehicle Code—California's "implied consent" law[1]—has provided for a six-month suspension of an individual's driver's license when the individual, after having been lawfully arrested for drunk driving and fully informed of his rights, refuses to submit to any one of three statutorily prescribed chemical tests which are designed to provide scientifically measurable evidence as to the degree of the driver's intoxication at the time of his arrest. Past cases have upheld the constitutionality of section 13353 against claims that the statute (1) violates the driver's privilege against self-incrimination,[2] (2) authorizes an unreasonable search or seizure,[3] (3) denies equal protection to variously defined classes,[4] and (4) fails to satisfy procedural due process requirements.[5]

[1]The statute's "implied consent" appellation derives from the fact that section 13353, subdivision (a) provides in part that "[a]ny person who drives a motor vehicle upon a highway...*shall be deemed to have given his consent* to a chemical test of his blood, breath or urine for the purpose of determining the alcoholic content of his blood if lawfully arrested for any offense allegedly committed while the person was driving a motor vehicle under the influence of intoxicating liquor." (Italics added.)

Unless otherwise indicated, all statutory references in this opinion are to the Vehicle Code.

[2]See, e.g., *Finley* v. *Orr* (1968) 262 Cal.App.2d 656, 660-663 [69 Cal.Rptr. 137]; cf. *Schmerber* v. *California* (1966) 384 U.S. 757, 760-765 [16 L.Ed.2d 908, 913-916, 86 S.Ct. 1826]; *People* v. *Sudduth* (1966) 65 Cal.2d 543 [55 Cal.Rptr. 393, 421 P.2d 401].

[3]See, e.g., *Westmoreland* v. *Chapman* (1968) 268 Cal.App.2d 1, 4 [74 Cal.Rptr. 363]; *Bush* v. *Bright* (1968) 264 Cal.App.2d 788, 790 [71 Cal.Rptr. 123]; cf. *Schmerber* v. *California, supra*, 384 U.S. 757, 766-772 [16 L.Ed.2d 908, 913-920].

[4]See, e.g., *Walker* v. *Department of Motor Vehicles* (1969) 274 Cal.App.2d 793, 796 [79 Cal.Rptr. 433]; *Pepin* v. *Department of Motor Vehicles* (1969) 275 Cal.App.2d 9, 11 [79 Cal.Rptr. 657]; *Anderson* v. *Cozens* (1976) 60 Cal.App.3d 130, 141-144 [131 Cal.Rptr. 256].

[5]See, e.g., *August* v. *Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 58-62 [70 Cal.Rptr. 172]; *Serenko* v. *Bright* (1968) 263 Cal.App.2d 682, 689-692 [70 Cal.Rptr. 1]; *Funke* v. *Department of Motor Vehicles* (1969) 1 Cal.App.3d 449, 455-456 [81 Cal.Rptr. 662]; cf. *Mackey* v. *Montrym* (1979) 443 U.S. 1 [61 L.Ed.2d 321, 99 S.Ct. 2612].

Undaunted by this wealth of authority confirming the validity of the statute, plaintiff in the instant case urges our court to strike down the statute as, in essence, a violation of "substantive due process." In support of his argument, plaintiff maintains that the "right to drive" is a "fundamental constitutional right" under the California Constitution, comparable in status, for example, to the constitutional right of free speech or freedom of religion, so that legislative enactments which limit an individual's freedom to drive are to be subjected to "strict scrutiny" by the judiciary. Relying on precedents arising primarily in the context of legislation limiting freedom of speech or privacy, plaintiff asserts that our court should invalidate section 13353 on the ground that the Legislature could have achieved the purposes of the legislation through the adoption of an alternative sanction "less restrictive" of an individual's right to drive than the six-month license suspension provided by the current provision.

As we shall explain, we find plaintiff's constitutional contention totally lacking in merit. Although automobile travel is without question an important aspect of life in contemporary California society and an individual's substantial interest in retaining his driver's license has properly been accorded a variety of legal protections, plaintiff has cited absolutely no authority, from California or elsewhere, which suggests that legislative regulation of either automobile driving or automobile drivers is in any manner constitutionally "suspect" or involves any of the considerations which in past cases have been viewed as justifying the extraordinary invocation of "strict judicial scrutiny" of the Legislature's substantive policy decisions. On the contrary, as we shall see, past authorities —while fully cognizant of the practical importance of an individual's "right to drive"—have uniformly recognized that the area of driving is particularly appropriate for extensive legislative regulation, and that the state's traditionally broad police power authority to enact any measure which reasonably relates to public health or safety operates with full force in this domain. ■ Because, as plaintiff concedes, section 13353 bears a reasonable relation to the preservation of safety on California highways, we reject plaintiff's constitutional challenge.

## 1. *The facts and proceedings below*

At approximately 11 p.m. on New Year's Eve, 1977, Officer DuVal of the Culver City Police Department observed plaintiff Ernesto Hernandez driving erratically on a public street. The officer turned on his

emergency light and directed Hernandez to pull his van over to the side of the road. When Hernandez did so and then got out of his van, he staggered against it and the officer assisted him to the sidewalk. The officer detected a strong odor of alcohol on Hernandez's breath, and noticed that his eyes were red and watery and that his speech was thick and slurred. After administering field sobriety tests and concluding that Hernandez was under the influence of alcohol, the officer placed him under arrest.

Immediately thereafter, the officer advised Hernandez of the requirements of California's implied consent law, reading verbatim from a laminated card which the officer carried for this purpose. The officer informed plaintiff: "You are required by state law to submit to a chemical test to determine the alcoholic content of your blood. You have a choice of whether the test is to be of your blood, breath or urine. If you refuse to submit to a test, your driving privilege will be suspended for a period of six months. You do not have the right to talk to an attorney or to have an attorney present before stating whether you will submit to a test, before deciding which test to take, or during the administration of the test chosen."

At the subsequent administrative hearing, the officer described plaintiff's response to the proffered choice: "I asked Mr. Hernandez if he understood the statement. He answered, 'Yeah, I understand.' I then asked him which test he would like to take and he said 'I won't take no test at all.' I then asked him if he understood that he would automatically lose his driver's license for six months, to which he stated, 'I don't give a damn. I don't, I don't want to take no tests.' I then asked subject Hernandez, 'You mean you don't want to take a blood test?' He answered, 'No.' I asked him, 'And you don't want to take a breath test?' He answered, 'No.' I asked him, 'And you don't want to take a urine test?' He answered 'Man, leave me alone. I don't want to take no tests, all I want to do is go home.'" Hernandez was then taken to the Culver City jail and booked on the drunk driving charge.

On January 30, 1978, defendant Department of Motor Vehicles (DMV) informed Hernandez of the imminent suspension of his driver's license pursuant to section 13353. At Hernandez's request, an administrative hearing on the suspension was conducted on March 20, 1978, and on June 16, 1978, the DMV notified Hernandez that the validity of the suspension had been sustained.

Hernandez then filed the present mandate proceeding, challenging the validity of his license suspension on the ground that section 13353, subdivision (b) is unconstitutional. The points and authorities accompanying the petition recognized that the statutory sanction of section 13353, subdivision (b)—a six-month suspension of a driver's license for refusing to submit to a chemical test—bears a rational and reasonable relation to the state's legitimate interest in highway safety. The petition argued, however, that because of the importance of the right to drive,[6] any legislative measure restricting this right—such as section 13353—must be subjected to "strict judicial scrutiny" and must be struck down if a court concludes that the Legislature could have accomplished the purposes of the legislation through the adoption of an alternative measure less restrictive of the right to drive. Asserting that instead of imposing a six-month suspension of one's driver's license for refusing to submit to a chemical test, the Legislature could have achieved the purposes of section 13353, subdivision (b) by providing that such a refusal would automatically give rise to a presumption of intoxication in any subsequent criminal proceeding, Hernandez maintained that the statute was unconstitutional. The trial court rejected Hernandez's constitutional claim and denied the requested writ of mandate. Hernandez now appeals from the adverse judgment.

2. *The normal presumption of constitutionality applies to legislative measures regulating an individual's right to drive an automobile and such a measure is valid so long as its provisions reasonably relate to any legitimate state interest, such as the preservation of the health or safety of the public.*

Section 13353, subdivision (b)—the statute at issue here—is perhaps a paradigm example of a classic "health and safety" police power measure, clearly enacted by the Legislature to foster the safety of the public in the use of the state's highways.[7] ■ As we noted shortly after the

---

[6]The petition noted that Hernandez is a bus driver and that the suspension of his driver's license would pose a particular hardship for him because it would result in at least the temporary loss of employment.

[7]Section 13353, subdivision (b) presently provides in full: "If any such person refuses the officer's request to submit to, or fails to complete, a chemical test, the department, upon receipt of the officer's sworn statement that he had reasonable cause to believe such person had been driving a motor vehicle upon a highway or upon other than a highway in areas which are open to the general public while under the influence of intoxicating liquor and that the person had refused to submit to, or failed to complete, the test after being requested by the officer, shall suspend his privilege to operate a mo-

statute's enactment 15 years ago: "Our implied consent statute, including section 13353, was enacted to fulfill the need for a fair, efficient and accurate system of detection and prevention of drunken driving." (*Kesler* v. *Department of Motor Vehicles* (1969) 1 Cal.3d 74, 77 [81 Cal.Rptr. 348, 459 P.2d 900].)

Prior to the enactment of the statute, both this court and the United States Supreme Court had explicitly held that when a person has been lawfully arrested for drunk driving the police, utilizing appropriate medical procedures, may *forcibly* remove a blood sample from the driver without his consent. (See *Schmerber* v. *California, supra*, 384 U.S. 757; *People* v. *Duroncelay* (1952) 48 Cal.2d 766, 771-772 [312 P.2d 690].) Despite the legality of such a coercive procedure, however, the Legislature recognized that "such an episode remains an unpleasant, undignified and undesirable one." (*People* v. *Superior Court* (*Hawkins*) (1972) 6 Cal.3d 757, 764 [100 Cal.Rptr. 281, 493 P.2d 1145].) In enacting section 13353, the Legislature sought to obviate these consequences for the driver and "avoid the possible violence which could erupt if forcible tests were made upon a recalcitrant and belligerent inebriate" (*Anderson* v. *Cozens, supra*, 60 Cal.App.3d 130, 143), while at the same time preserving the state's strong interest in obtaining the best evidence of the defendant's blood alcohol content at the time of the arrest. Thus, "the Legislature devised an additional or alternative method of compelling a person arrested for drunk driving to submit to a test for intoxication, by providing that such person will lose his automobile driver's license for a period of six months if he refuses to submit to a test for intoxication. The effect of this legislation is to equip peace officers with an instrument of enforcement not involving physical compulsion." (*People* v. *Superior Court* (*Hawkins*), *supra*, 6 Cal.3d at p. 765.)

Although plaintiff recognizes that the six-month suspension sanction provided by section 13353, subdivision (b) bears a rational and reasonable relation to the state's interest in enforcing its drunk driving laws, plaintiff asserts that we should nonetheless hold the statute unconstitutional as a violation of substantive due process because the Legislature assertedly could have achieved the purposes of the statute by devising an alternative "less restrictive" sanction when a driver refuses to consent to a chemical test. In pursuing this contention, however, plain-

tor vehicle for a period of six months. The officer's sworn statement shall be submitted on a form furnished or approved by the department. No such suspension shall become effective until 10 days after the giving of written notice thereof, as provided for in subdivision (c)."

tiff has lost sight of one of the principal lessons of the past half-century of American constitutional law. ■ As our court explained in *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 359 [55 Cal.Rptr. 23, 420 P.2d 735]: "In passing upon [a substantive due process challenge to a legislative police power measure], we exercise an extraordinary power over a coordinate branch of government and perform a correspondingly narrow function: *we simply determine whether the statute reasonably relates to a legitimate governmental purpose....* '"The doctrine...that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely...has long since been discarded...".'" (Italics added.)

We reaffirmed this fundamental constitutional principle in our recent decision in *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398 [149 Cal.Rptr. 375, 584 P.2d 512], emphasizing that "[i]n the exercise of its police power a Legislature does not violate due process so long as an enactment is...reasonably related to a proper legislative goal. The wisdom of the legislation is not at issue in analyzing its constitutionality, and *neither the availability of less drastic remedial alternatives* nor the legislative failure to resolve all related ills at once will invalidate a statute." (Italics added.) (See also *Cory* v. *Shierloh* (1981) 29 Cal.3d 430, 438 [174 Cal.Rptr. 500, 629 P.2d 8].)

■ Plaintiff contends, however, that although this deferential substantive due process analysis may be appropriate in reviewing most police power measures, the foregoing constitutional principles should not apply to measures which impinge upon an individual's "right to drive." Pointing to a number of California cases which indicate that legislative measures which significantly interfere or impinge upon "fundamental constitutional rights" are properly subjected to "strict judicial scrutiny" (see, e.g., *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 48-49 [157 Cal.Rptr. 855, 599 P.2d 46] (right to petition government); *People* v. *Glaze* (1980) 27 Cal.3d 841, 845-846 [166 Cal.Rptr. 859, 614 P.2d 291] (freedom of speech)), plaintiff contends that the "right to drive" constitutes such a "fundamental constitutional right." He argues that legislative measures, such as the instant statute, which operate to limit one's right to drive are constitutional only if they pass muster under the rigorous strict scrutiny standard.

Past California cases, however, provide no support whatsoever for plaintiff's contention. Over 30 years ago, in *Escobedo* v. *State of California* (1950) 35 Cal.2d 870 [222 P.2d 1] (overruled on other grounds

in *Rios* v. *Cozens* (1972) 7 Cal.3d 792 [103 Cal.Rptr. 299, 499 P.2d 979]), our court—while acknowledging the great importance of driving —at the same time explicitly emphasized that "it is... well established ...that usage of the highways is subject to reasonable regulation for the public good.... 'The use of the public highways by motor vehicles, with its constant dangers, renders the reasonableness and necessity of regulation apparent.... *Any appropriate means adopted by the states to insure competence and care on the part of its licensees and to protect others using the highway is consonant with due process.*' [Citations]." (Italics added.) (*Id.*, at p. 876.) (See also *Watson* v. *Division of Motor Vehicles* (1931) 212 Cal. 279, 283 [298 P. 481]; *Hendrick* v. *Maryland* (1915) 235 U.S. 610, 622 [59 L.Ed. 385, 390, 35 S.Ct. 140].)[8]

More recently, in a series of cases reaching back more than a decade, the California Courts of Appeal have uniformly rejected the application of "strict judicial scrutiny" to challenges mounted against section 13353. In *Spurlock* v. *Department of Motor Vehicles* (1969) 1 Cal. App.3d 821, 830 [82 Cal.Rptr. 42], the earliest of these decisions, the court explained: "The interest which the Legislature is attempting to regulate by Vehicle Code, section 13353, is not one protected by specific guarantee of the United States Constitution; neither does it affect the integrity of the political process, nor does its impact fall most heavily upon a discrete and insular minority. (See *United States* v. *Carolene Products Co.* [(1938)] 304 U.S. 144, [152-153,] fn. 4 ....) Thus the standard to be applied in determining its conformity with the requirements of due process is that enunicated in *Williamson* v. *Lee Optical of Oklahoma* [(1955)] 348 U.S. 483, [487-488] [99 L.Ed. 563, 571-572, 75 S.Ct. 461]: '...the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.'"[9]

---

[8]In *Watson*, our court stated: "The legislative power to regulate travel over the highways and thoroughfares of the state for the general welfare is extensive. It may be exercised in any reasonable manner to conserve the safety of travelers and pedestrians. Since motor vehicles are instruments of potential danger, their registration and the licensing of their operators have been required almost from their first appearance. The right to operate them in public places is not a natural and unrestrained right, but a privilege subject to reasonable regulation, under the police power, in the interest of the public safety and welfare. [Citation.] The power to license imports the further power to withhold or to revoke such license upon noncompliance with prescribed conditions." (212 Cal. at p. 283.)

[9]Although the *Spurlock* decision's enumeration does not exhaust the categories of "fundamental constitutional rights" as to which legislative restrictions or classifications

*McGlothlen* v. *Department of Motor Vehicles* (1977) 71 Cal.App.3d 1005, 1021 [140 Cal.Rptr. 168], reiterated *Spurlock*'s conclusion: "The right to drive a motor vehicle on the public highways is not such a fundamental right as to require strict scrutiny of any law which appears to classify the driving privileges of persons otherwise similarly situated, and to necessitate a compelling state interest before such classification may be justified." (See also *Department of Motor Vehicles* v. *Superior Court* (1976) 58 Cal.App.3d 936, 942 [130 Cal.Rptr. 311].)[10]

Although plaintiff challenges the present vitality of these established California precedents on several grounds, each of the plaintiff's arguments is manifestly flawed. Plaintiff initially relies upon a series of recent cases of both the United States Supreme Court and of our own court involving procedural due process challenges to various aspects of a state's driver's license suspension process. (See, e.g., *Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586]; *Dixon* v. *Love* (1977) 431 U.S. 105 [52 L.Ed.2d 172, 97 S.Ct. 1723] *Mackey* v. *Montrym, supra*, 443 U.S. 1; *Rios* v. *Cozens, supra*, 7 Cal.3d 792.) While these cases unquestionably hold "[t]hat the Due Process Clause applies to a state's suspension or revocation of a driver's license" (*Mackey* v. *Montrym, supra*, 443 U.S. 1, 10, fn. 7 [61 L.Ed.2d 321, 329]), none of the cases contains any suggestion whatsoever that in applying the substantive aspect of due process to such license suspension statutes, courts are to discard the normal presumption of constitutionality and to subject such statutes to strict judicial scrutiny rather than to the ordinary reasonable relationship standard.[11]

---

may properly be subject to strict scrutiny under the California Constitution (see, e.g., *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252 [172 Cal.Rptr. 866, 625 P.2d 779]; *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436]; *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 760-768 [135 Cal.Rptr. 345, 557 P.2d 929]), plaintiff has pointed to no California authority which supports the claim that the "right to drive" warrants any such extraordinary constitutional solicitude.

[10]In *Kesler* v. *Department of Motor Vehicles, supra*, 1 Cal.3d 74, 77, we rejected a contention—somewhat analagous to that pursued here—which urged the court to second-guess the Legislature's drafting of section 13353, explaining that "[w]hether the purposes of the implied consent statute would be more fairly, efficiently or accurately attained by [plaintiff's suggested modification] is a matter for the Legislature."

[11]Indeed, the United States Supreme Court's recent decision in *Mackey* quite clearly eschews the type of strict scrutiny review suggested by petitioner, observing: "Nor is it any answer to the Commonwealth's interest in public safety that its interest could be served as well in other ways. The fact that the Commonwealth, for policy reasons of its own, elects not to summarily suspend those drivers who do take the breath-analysis test does not...in any way undermine the Commonwealth's strong interest in summarily removing from the road those who refuse to take the test. A state plainly has the right

Plaintiff's reliance on this line of procedural due process cases appears to rest upon an assumption that whenever a "property" or "liberty" interest is accorded the protections of procedural due process, that interest becomes a "fundamental constitutional right" so that legislative measures regulating such an interest are necessarily subject to strict scrutiny. This assumption is totally unfounded. Recent decisions have established that the whole panoply of ordinary property rights are generally protected from summary termination or deprivation by procedural due process (see, e.g., *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536, 547-552 [96 Cal.Rptr. 709, 488 P.2d 13]; *Fuentes* v. *Shevin* (1972) 407 U.S. 67, 88-90 [32 L.Ed.2d 556, 574-576, 92 S.Ct. 1983]) but no case has even remotely suggested that the constitutionality of substantive legislative measures regulating or restricting such "protected property" rights are to be judged under a "strict scrutiny standard."[12]

As Justice Brennan explained in *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.* (1978) 439 U.S. 96, 106-107 [58 L.Ed.2d 361, 373-374, 99 S.Ct. 403], in upholding the constitutionality of a California statute regulating business franchises: "Even if the right to franchise had constituted a protected interest [safeguarded by procedural due process guarantees] when California enacted the Automobile Franchise Act, California's Legislature was still constitutionally empowered to enact a general scheme of business regulation that imposed reasonable restrictions upon the exercise of the right. ... At least since the demise of the concept of 'substantive due process' in the area of economic regulation, this court has recognized that '[l]egislative bodies have broad scope to experiment with economic problems....' [Citation.]"

---

to offer incentives for taking a test that provides the most reliable form of evidence of intoxication for use in subsequent proceedings.... And, in exercising its police powers, the Commonwealth is not required by the Due Process Clause to adopt an 'all or nothing' approach to the acute safety hazards posed by drunk drivers." (443 U.S. at pp. 18-19 [61 L.Ed.2d at pp. 334-335].)

[12]We note that while the United States Supreme Court has continued to hold that the application of federal procedural due process principles is wholly dependent upon the existence of a "protected property or liberty interest" or "entitlement" (see, e.g., *Connecticut Board of Pardons* v. *Dumschat* (1981) 452 U.S. 458 [69 L.Ed.2d 158, 101 S.Ct. 2460]), in *People* v. *Ramirez* (1979) 25 Cal.3d 260, 268 [158 Cal.Rptr. 316, 599 P.2d 622], our court recognized that under the California Constitution "freedom from arbitrary adjudicative procedures is a substantive element of one's liberty" so that "when an individual is subjected to deprivatory governmental action, he always has a due process liberty interest both in fair and unprejudiced decision-making and in being treated with respect and dignity."

As we have seen, past cases have long established that the Legislature has similarly broad authority to regulate with respect to safety hazards related to driving. The procedural due process protections that have been accorded in the license suspension process do not diminish the Legislature's substantive police power authority in this area nor justify strict judicial scrutiny of the Legislature's substantive policy decisions.

In addition to his misguided reliance on the procedural due process cases, plaintiff attempts to draw support from a second set of cases that is equally inapposite to the constitutional claim which he asserts. In *McConville v. Alexis* (1979) 97 Cal.App.3d 593 [159 Cal.Rptr. 49], the Court of Appeal was faced with the question of whether a trial court should apply the "substantial evidence" or the "independent judgment" standard of review in passing upon a challenge to a quasi-judicial administrative decision by the DMV which resulted in a six-month suspension of an individual's driver's license. As the *McConville* court noted, this court's decisions in *Bixby v. Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242] and *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29], established that "[w]hen an administrative decision affects a right which has been legitimately acquired or is otherwise 'vested,' and when that right is of a fundamental nature from the standpoint of its economic aspect or its 'effect...in human terms and the importance ...to the individual in the life situation,' then a full and independent *judicial* review of that decision is indicated because '[t]he abrogation of the right is too important to the individual to relegate it to exclusive administrative extinction.'" (*Strumsky*, 11 Cal.3d at p. 34, quoting *Bixby*, 4 Cal.3d at p. 144.)

Although an earlier Court of Appeal decision—*McGue v. Sillas* (1978) 82 Cal.App.3d 799 [147 Cal.Rptr. 354]—had held that the temporary loss of one's driver's license was not sufficiently grievous to warrant the application of the independent review standard, the *McConville* court rejected that conclusion and found instead that "there can be little question but that possession of a driver's license rises to the level of a fundamental right under *Bixby* in terms of both the economic implications relating thereto and 'the importance of' the possession.'to the individual in the life situation.'" (97 Cal.App.3d at p. 600.) Focusing only upon an excerpt of the above passage to the effect that "possession of a driver's license rises to the level of a fundamental right," plaintiff in the instant case suggests that *McConville* provides

support for his claim that driving is a "fundamental constitutional right" for strict scrutiny purposes.

Plaintiff's contention is clearly specious.  █   We may assume without deciding that the loss of a driver's license does implicate interests sufficiently important "to the individual in the life situation" to warrant *independent review of a quasi-judicial administrative decision* suspending or terminating such right. It does not follow, however, that legislative measures regulating or limiting the possession of a driver's license are subject to strict judicial scrutiny.

In fact, plaintiff's argument in this regard betrays a serious misunderstanding of the basic foundation of the *Bixby-Strumsky* doctrine. As both *Bixby* and *Strumsky* explain, the standard of review question with which those cases deal relates to the appropriate relationship between *administrative* and *judicial* adjudicatory decisions, and does not concern the constitutional legitimacy or validity of legislative policy judgments at all. Thus, under *Bixby-Strumsky*, the "fundamental right" category does not identify areas in which substantive legislative judgments are in any manner constitutionally suspect or justify unusual judicial scrutiny; rather, that category simply encompasses those quasi-judicial administrative decisions that have "an impact on the individual 'sufficiently vital...to compel a full and independent review' by the court." (*Interstate Brands* v. *Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 779 [163 Cal.Rptr. 619, 608 P.2d 707].)

Indeed, even a cursory review of the *Bixby-Strumsky* line of decisions makes it abundantly clear that the applicability of the independent judgment standard of review does not in any sense suggest that legislative measures pertaining to the individual interest at issue are properly subject to strict scrutiny review. Thus, for example, in *Dickey* v. *Retirement Board* (1976) 16 Cal.3d 745, 750-751 [129 Cal.Rptr. 289, 548 P.2d 689], we held that the independent judgment standard should be applied in reviewing an administrative decision affecting an employee's receipt of disability payments, but we in no way intimated that the normally extensive legislative measures regulating the terms and eligibility of such disability payments were properly subject to a strict scrutiny constitutional review.

Similarly, our decision in *Strumsky*—applying independent review to an administrative determination denying retirement benefits—plainly did not contemplate that all statutory measures dealing with the subject

of retirement benefits are appropriate subjects for an unusually rigorous substantive due process review. Accordingly, the fact that an administrative decision suspending an individual's driver's license may well affect a "fundamental right" within the meaning of the *Bixby-Strumsky* doctrine, does not in any manner support plaintiff's contention that the statute at issue here is properly subject to a strict scrutiny constitutional review.

■ In sum, past California cases clearly establish that the constitutionality of legislative measures regulating the granting and suspension of driver's licenses for the public safety is to be judged against the restrained substantive due process standard traditionally applied to ordinary police power measures. Plaintiff has demonstrated no basis whatsoever to justify a departure from that approach. Inasmuch as section 13353, subdivision (b) bears a reasonable relation to the state's interest in the effective enforcement of its drunk driving laws, we conclude that the statute is constitutional.

The judgment is affirmed.

Richardson, J., Tamura, J.,* and Ashby, J.,* concurred.

NEWMAN, J.—I concur in the result. In my view the troubling issue (unfortunately not argued here) is equal protection, not due process. We may agree that the six-month penalty is not excessive. It does not follow that therefore the process of penalizing is nondiscriminatory.[1]

The questionable discrimination involves comparing the harm done appellant here with the apparent tolerance accorded to someone who, having taken the tests, flunks. That person may continue to drive pending trial, it seems, even when the tests show "0.10 percent or more by weight of alcohol in [his or her] blood [when, accordingly,] it shall be presumed that the person was under the influence of intoxicating liquor at the time of the alleged offense." (Veh. Code, § 23126, subd. (a)(3).)

---

*Assigned by the Chairperson of the Judicial Council.

[1]*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 404 [149 Cal.Rptr. 375, 584 P.2d 512], ruled that a penalty violates due process when it is "mandatory, mechanical, potentially limitless in its effect regardless of circumstance" and when "[i]ts severity appears to exceed that of sanctions imposed for other more serious civil violations...." The six-month license suspension here probably does not fit that proscription. (See *Kesler* v. *DMV* (1969) 1 Cal.3d 74 [81 Cal.Rptr. 348, 459 P.2d 900].)

One observer has reported that, in 1980, "26,171 California motorists had their driver's licenses suspended because they refused to take one of the three chemical tests...[whereas] 215,718 persons were convicted of drunken driving...." (Kang, *High court hears the arguments on 'right to drive'*, S.F. Sunday Examiner & Chronicle (Mar. 29, 1981) p. A7; cf. Erwin, *Trial Tactics: Preparing DUI Defendants and Defense Witnesses for Cross-Examination* (1981) 8 Forum, No. 1, pp. 18, 23 ("Not under the influence at .10"); Plotkin, *Most Blood Testing for Alcohol Content Is in Error* (1978) 5 Forum, No. 5, p. 9; Fitzgerald & Hume, *The Single Chemical Test for Intoxication: A Challenge to Admissibility* (1981) 66 Mass.L.Rev. 23; Alternative Sentencing Evaluation Committee for Driving under the Influence Report and Recommendations to the L.A. County Municipal Judges' Association and Presiding Judges' Association (Mar. 26, 1981).) "Added to the constitutional problems of these statutes is the very nature of the chemical tests themselves. Far from the infallibility one would expect of evidence resulting in the imposition upon a defendant of proving himself to be innocent, these tests appear to be no more reliable than any other form of scientific evidence, and very possibly considerably less reliable." (Taylor, *Blood-alcohol presumptions: Guilty until proved innocent* (1978) 53 State Bar J. 170, 177.)

The attorney here hypothesized a presumption and argued that, under the "compelling [state] interest test," his presumption exemplifies "less drastic means." He contends that California's interest in highway safety would be as well-served by a presumption that his client was under the influence of alcohol as by the six-month suspension of the license.

I believe that neither the federal nor the state Constitution requires that the Legislature adopt that or a similar proposal. The aim of the six-month suspension is to persuade certain drivers to take at least one of the tests. The Legislature has concluded that evidence thus obtained and utilized pursuant to rules based on varying levels of intoxication is likely to be useful and reliable at trial. Test results are treated as superior to testimonial disputes between defendants and the arresting officers. It is true that a presumption *might* jeopardize a driver's hope for an adjudication in his favor, and that thus he might be persuaded to submit to testing. By no means, though, should that lead us to conclude that the Legislature's choice of a more powerful persuader (i.e., its threat of a six-month suspension) was unauthorized. (Cf. *People* v. *Glaze* (1980) 27 Cal.3d 841, 847 [166 Cal.Rptr. 859, 614 P.2d 291].)

I am unable to indorse the view that the right to drive is not fundamental. But the statute nonetheless survives because it meets the strict scrutiny test.

**MOSK, J.**—I dissent.

It is impossible to explain to a bus driver, a taxi driver, a truck driver, a sales representative, a driver of an ambulance or a fire engine, a public utility repairman, an electrician or a plumber, a physician on hospital call, the driver of an employees' carpool, or a mother fulfilling her responsibility to deliver hers and her neighbors' children to school that their absolute dependence upon operating a motor vehicle is not a fundamental right. Indeed the plaintiff Hernandez is a bus driver; thus the deprivation of his driver's license directly and adversely affects his very livelihood and his ability to survive economically.

The majority pay lip service to automobile travel as "an important aspect of life in contemporary California society" and concede the authorities are "fully cognizant of the practical importance of an individual's 'right to drive'." But then they proceed to accord that significant element of contemporary life the barest minimum of constitutional protection.

The result is contrary to the views this court expressed in *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144 [93 Cal.Rptr. 234, 481 P.2d 242], and repeated in *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 520 P.2d 29]: "[w]hen an administrative decision affects a right which has been legitimately acquired or is otherwise 'vested,' and when that right is of a fundamental nature from the standpoint of its economic aspect or its 'effect . . . in human terms and the importance . . . to the individual in the life situation,' then a full and independent *judicial* review of that decision is indicated because '[t]he abrogation of the right is too important to the individual to relegate it to exclusive administrative extinction.'" (Italics in original.)

The Court of Appeal in *McConville* v. *Alexis* (1979) 97 Cal.App.3d 593, 600 [159 Cal.Rptr. 49], arrived at what I believe to be the appropriate analysis: "As we see it, there can be little question but that possession of a driver's license rises to the level of a fundamental right under *Bixby* in terms of both the economic implications relating thereto and 'the importance of' the possession 'to the individual in the life situa-

tion.' (*Bixby* v. *Pierno, supra*, 4 Cal.3d 130, 144.) This, of course, is most obviously true with respect to those individuals whose occupations depend directly on the ability to drive, such as truckdrivers or delivery persons. But even for those for whom driving is merely a way to get to and from a place such as work or school, the loss of a driver's license for a six-month period can constitute a severe hardship."

The United States Supreme Court reached a similar conclusion in *Bell* v. *Burson* (1971) 402 U.S. 535, 539 [29 L.Ed.2d 90, 94, 91 S.Ct. 1586]: "[o]nce [driver's] licenses are issued...their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees."

I am not prepared to declare that the instant statute fails to meet the strict scrutiny test. I merely conclude that the majority err in not measuring the section by that test. It is, of course, considerably more exacting than the simplistic methods employed in the prevailing opinion.

Bird, C. J., concurred.

Appellant's petition for a rehearing was denied November 19, 1981. Mosk, J., was of the opinion that the petition should be granted.