[No. H012609. Sixth Dist. Mar. 28, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
RANDY A. IRELAND, Defendant and Appellant.

## Counsel

Ben Rice and Margaret H. Marr for Defendant and Appellant.

Arthur Danner III, District Attorney, and Lisa Agliano, Assistant District Attorney, for Plaintiff and Respondent.

## Opinion

**PREMO, J.**—Defendant Randy A. Ireland was charged by complaint in municipal court with misdemeanor offenses of driving under the influence of

alcohol (Veh. Code, § 23152, subd. (a)),[1] and driving with .08 percent or more, by weight, of alcohol in his blood (§ 23152, subd. (b)).

The jury found defendant guilty on the section 23152, subdivision (b) count, but hung on the section 23152, subdivision (a) count. The trial court declared a mistrial on the subdivision (a) count, then later dismissed that count conditioned "upon ratification of verdict."

Defendant appealed to the appellate department of the superior court, which affirmed the judgment. More than a year later, the appellate department recalled the remittitur and certified the appeal to us. We accepted the transfer of the appeal because of the importance of the issues raised.

■ During the pendency of the appeal with this court, defendant requested that judicial notice be taken of certain scientific literature and legislative histories. Respondent interposed no objection. We decided to consider that request together with the consideration of the merits of this appeal. We now resolve to take judicial notice of the legislative histories submitted. As to the scientific literature, we take judicial notice only to the existence of the writings; the truth of the scientific claims written about cannot be judicially noticed, but must be proved, since some of those claims are currently the subject of controversy. (Evid. Code, § 452.)

We affirm the judgment.

### FACTS

On October 19, 1991, at 11:30 p.m., Capitola City Police Officer Philip Wowak stopped a van which he had observed speeding and following too closely. As Wowak approached the van, defendant driver rolled down the window. The officer smelled the odor of alcohol coming from the vehicle. He noticed, among other symptoms, that defendant's speech was slurred, his eyes were very bloodshot, and his movements were very slow and deliberate when retrieving his wallet and driver's license. Wowak conducted field sobriety tests, which defendant failed. Defendant told Wowak he had consumed one beer earlier that evening. Wowak arrested defendant for driving under the influence.

Wowak advised defendant that he had the choice of a blood, breath, or urine test. Defendant chose the breath test. Wowak, who had been trained in administering breath tests, administered the breath test to defendant at 12:01 a.m. and 12:02 a.m. The results showed alcohol concentrations of 0.11 percent and 0.10 percent.

---

[1]Further statutory references are to the Vehicle Code unless otherwise stated.

Wowak advised defendant he could choose another test at no charge. Defendant declined to do so, saying "this is all he wanted to do."

The People presented as its expert witness Juan Bergado, a criminalist with the Department of Justice. Bergado reviewed the accuracy logs of the Intoxilyzer 5000 machine which was used for defendant's breath test, and concluded that the instrument was operating properly on the date of defendant's test.

Bergado explained that the 2,100:1 breath-to-blood conversion ratio is determined from correlation studies wherein blood samples drawn from an individual's arm are compared to breath samples taken from that individual. He further explained that the 2,100:1 ratio represents the parts of alcohol found in the breath compared to the parts of alcohol found in the blood drawn from the arm.

Testifying in his defense, defendant testified that he had a beer at a relative's home about 6 p.m. About 7 p.m., he, together with some relatives and friends, went to a restaurant for dinner. The dinner took two hours, during which time defendant consumed two beers. At 9 or 9:15 p.m., defendant went to another bar where he and his relatives and friends stayed for a half an hour or 40 minutes. They then went to a third bar (Castaways) where defendant consumed one beer. Approximately one hour later, defendant left for home.

Defendant's expert witness, William Gigiere, explained the basis of the 2,100:1 alcohol-in-breath to alcohol-in-blood ratio. He testified that alcohol is first absorbed into the artery, then gets distributed throughout the body. The neurological effects of alcohol are the result of the alcohol coming in contact with the brain, which is the control center of the body. Alcohol reaches the veins after peak absorption. At peak absorption, the arterial value of alcohol is equal to its venous value "from a practical standpoint." Prior to peak absorption, the amount of alcohol in the artery (reflected by the breath test) will be greater than the amount of alcohol in the veins (reflected by the blood test). Consequently, the 2,100:1 statutory partition ratio will be overstated during the absorptive phase and understated during the postabsorptive phase.

Gigiere testified that he had tested defendant on November 24, 1991, to determine defendant's partition ratio. Defendant's partition ratio during the absorptive phase was 1,329:1. During the postabsorptive stage, defendant's breath alcohol result was slightly lower than his venous blood alcohol result.

On cross-examination, Gigiere stated he could not say what defendant's partition ratio was at the time of defendant's arrest. Gigiere acknowledged that a person's partition ratio is germane to the time of the test.

## CONTENTS

In this appeal, defendant contends:

1. The Legislature did not create a new substantive offense of driving with an excessive breath-alcohol content.

2. The Legislature did not intend to exclude evidence of the variability of blood:breath partition ratios.

3. Due process and the right to confront adverse witnesses entitle the accused to present evidence of the variability between blood and breath test results.

4. Unless defendants are allowed to challenge the blood:breath partition ratio, the statute creates an unconstitutional mandatory presumption.

5. To interpret the statute as creating a new offense of "excessive breath-alcohol" would violate equal protection because similarly situated individuals would be held to different standards of conduct based on the arbitrary factor of which test was given.

## DISCUSSION

### *Creation of New Substantive Offense*

■ Defendant contends the Legislature did not create a new substantive offense of driving with an excessive breath-alcohol content. The contention is without merit.

The critical issue is not whether the 1990 amendment (hereafter, 1990 amendment) to section 23152, subdivision (b), creates a new substantive offense of driving with an excessive breath-alcohol content, but whether the Legislature has the power to prohibit any person with a certain amount of alcohol concentration in his or her breath from driving a motor vehicle. It is immaterial whether the prohibition is viewed as a new offense or as an alternative definition of an existing offense.

As amended in 1990, section 23152, subdivision (b), reads in pertinent part: "It is unlawful for any person who has 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle. [¶] For purposes of this subdivision, percent, by weight, of alcohol in a person's blood shall be based upon grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath." (See Stats. 1990, ch. 708, § 1.)

California's earliest law on drunk driving was a 1913 statute which provided: "No intoxicated person shall operate or drive a motor or other vehicle upon any public highway within this state." (Stats. 1913, ch. 326, § 17, p. 646; *Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 262 [198 Cal.Rptr. 145, 673 P.2d 732].)

In 1969, the Legislature, recognizing the need for a more precise understanding of the offense of "driving under the influence," created a presumption that the driver is under the influence if he or she had .10 percent or more by weight of alcohol in his or her blood. (*Burg* v. *Municipal Court, supra,* 35 Cal.3d at p. 263; cf. Stats. 1969, ch. 231, § 1, p. 565.)

Reliance on this presumption subsequently proved inadequate. The Legislature realized that the ultimate question was still "defined in terms of the defendant's subjective behavior and condition: 'Was the defendant under the influence at the time he drove?' " (*Burg* v. *Municipal Court, supra,* 35 Cal.3d at p. 263.) In *Burg,* the court observed that "[c]elerity and certainty of punishment were frustrated by the ambiguity of the legal criteria; no matter what his blood-alcohol level, a defendant could escape conviction merely by raising a doubt as to his intoxication. [Citations.]" (*Ibid.*)

The magnitude of the problem was described by the court in *Burg*: "Nearly half of the traffic deaths in California between 1976-1980 involved drinking drivers. [Citation.] Nearly one-quarter of all traffic accidents resulting in injury involved the use of alcohol. [Citation.] Traffic deaths in the United States exceed 50,000 annually, and approximately one-half of those fatalities are alcohol-related. [Citations.] [¶] The drunk driver cuts a wide swath of death, pain, grief, and untold physical and emotional injury across the roads of California and the nation. The monstrous proportions of the problem have often been lamented in graphic terms by this court and the United States Supreme Court. [Citations.] As observed in *Breithaupt* v. *Abram* (1957) 352 U.S. 432 [1 L.Ed.2d 448, 77 S.Ct. 408], '[t]he increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield.' [Citation.] Indeed, in the years 1976 to 1980 there were many more injuries to California residents in alcohol-related traffic accidents than were suffered by the entire Union Army during the Civil War, and more were killed than in the bloodiest year of the Vietnam War. [Citation.] Given this setting, our observation that '[d]runken drivers are extremely dangerous people' [citation] seems almost to understate the horrific risk posed by those who drink and drive." (35 Cal.3d at pp. 261-262.)

In 1981, the Legislature fortified the drunk driving laws by amending subdivision (b) to section 23152. That amended subdivision stated: "It is

unlawful for any person who has 0.10 percent or more, by weight, of alcohol in his or her blood to drive a vehicle upon a highway or upon other than a highway in areas which are open to the general public. [¶] For purposes of this subdivision, percent, by weight, of alcohol shall be based upon grams of alcohol per 100 milliliters of blood." (See Stats. 1981, ch. 940, § 33, p. 3578.)

In *Burg* v. *Municipal Court, supra,* 35 Cal.3d at page 265, the court held that section 23152, subdivision (b), established a new and separate offense. More significantly, the court held that under the subdivision (b) scheme, it was no longer necessary to prove that the defendant was in fact under the influence; it was enough to prove that the defendant's blood-alcohol level was 0.10 percent or more.

The 1981 addition of subdivision (b) to section 23152 did not end the Legislature's quest for answers to the continuing "slaughter on our highways." In 1989, the Legislature further toughened its laws by lowering the blood-alcohol level requirement from .10 percent to .08 percent. (Stats. 1989, ch. 1114, § 27, p. 4040.)

However, because the proscribed driving was still based on the amount of alcohol present in the person's blood, it was necessary, in the case of defendants who elected urine or breath tests, to convert the alcohol readings in those tests to their corresponding blood-alcohol readings. The conversion was done by using the guidelines set forth in title 17, California Code of Regulations, section 1220.4, subdivision (f): "A breath alcohol concentration shall be converted to an equivalent blood alcohol concentration by a calculation based on the relationship: the amount of alcohol in 2,100 milliliters of alveolar breath is equivalent to the amount of alcohol in 1 milliliter of blood."

The conversion requirement produced attacks on the reliability of the partition ratio. As noted in *People* v. *Lepine* (1989) 215 Cal.App.3d 91, 94 [263 Cal.Rptr. 543]: "[T]he ratio of 2,100 to 1 is not constant and varies from individual to individual and from time to time. . . . [¶] [V]ariations in partition ratios are the function of whether the individual is still absorbing alcohol at the time the sample was taken, the temperature of the lungs, the speed of exhalation, the depth of exhalation, the amount of humidity in the air, the amount of mucus in the lungs and the individual's hematocrit, i.e., the ratio of blood cells to total blood volume."

The need for the prosecution to prove that breath-test readings met the .08 percent requirement when converted to blood-alcohol readings did not promote the legislative scheme. The Assembly Committee on Public Safety, the Senate Rules Committee, and the Senate Committee on Judiciary all decried

that the challenges to the accuracy of the partition ratio had resulted in "expensive and time consuming evidentiary hearings and undermine[d] successful enforcement of driving under the influence laws." (Hearing notes of Assem. Com. on Pub. Saf. (May 15, 1990) Assem. Bill No. 4318.)

In 1990, Assembly Bill No. 4318 (hereafter, AB 4318) was introduced to "[e]liminate the need for conversion of a breath quantity to a blood concentration of alcohol by statutorily defining driving under the influence of alcohol in terms of the concentration of alcohol found in the breath when breath analysis is used." (Assem. Com. on Public Safety, May 15, 1990 hearing.) The committee explained that "[t]he complexities of the existing conversion or partition ratio result in a significant number of cases being challenged on the accuracy and applicability of the partition ratio." (Hearing notes of Assem. Com. on Pub. Saf., *supra*, AB 4318)

The Legislature's dissatisfaction with the conversion requirement led the Assembly Committee on Public Safety to focus its hearings on the specific issue of: "Should the offense of driving under the influence of alcohol be statutorily defined in terms of the concentration of alcohol found in the breath when breath analysis is used?" (Assem. Com. on Pub. Saf., May 15, 1990 hearing.)

The hearing notes of the Assembly Committee on Public Safety disclose that in addressing this issue, the committee considered the opinions of experts on the subject. Among the opinions expressly noted were those of M. F. Mason, Ph.D., Professor of Forensic Medicine and Toxicology, and K. M. Dubowski, Ph.D., Professor of Medicine and Director of Toxicology Laboratories, who had recommended that " 'the conversion of a breath quantity to a blood concentration of ethanol, for forensic purposes, should be abandoned and the offense of driving while under the influence of alcohol should be statutorily defined in terms of the concentration of ethanol found in the breath in jurisdictions employing breath analysis. [Citation.]' "

At the Assembly third reading, the digest of AB 4318 stated that the bill would "[e]liminate the need for conversion of a breath quantity to a blood concentration of alcohol by statutorily defining driving under the influence of alcohol in terms of the concentration of alcohol found in the breath when breath analysis is used."

In the Senate, two committees conducted hearings on AB 4318. Both the Senate Rules Committee (Aug. 7, 1990) and the Senate Committee on the Judiciary (1989-1990 Reg. Sess.) recognized that AB 4318 "would statutorily define the offense of driving under the influence of alcohol in terms of

the concentration of alcohol found in the breath when breath analysis is used." Both committees also observed that AB 4318 "would eliminate the need for conversion of a breath quantity to a blood concentration of alcohol by statutorily defining driving under the influence of alcohol in terms of the concentration of alcohol found in the breath when the breath analysis is used."

AB 4318 was not the first California legislative attempt to define driving under the influence in terms of the alcohol concentration in a person's breath. A precursor, Senate Bill No. 1119 (Stats. 1989, ch. 1114; hereafter, SB 1119), had earlier provided that chemical tests could alternatively be based on grams of alcohol per 210 liters of breath. However, SB 1119 had an effective date of January 1992. The Legislature did not want to wait until 1992 to put the new scheme into effect. AB 4318 was accordingly introduced to advance the operative date of the change.

As stated by the Assembly Committee on Public Safety: "Last year the Legislature approved and the Governor signed Senate Bill 1119 (Seymour) which, effective January 1992, eliminates the DUI partition ratio, an unnecessarily complicated method of converting units of alcohol per liter of breath into the current standard of .08% blood alcohol per milliliter of blood. AB 4318 simply speeds up the effective date to January 1, 1991, in an effort to provide relief to our beleaguered DUI trial process. [¶] [] SB 1119 set the standard for breath alcohol content at grams of alcohol per 210 liters breath or grams of alcohol per 100 milliliters of blood. AB 4318 merely speeds up the effective date of this clarifying language. [¶] AB 4318 provides a necessary tool in our ongoing battle against drunk drivers."

The intent of AB 4318 to eliminate conversion and, instead, alternatively define driving under the influence "in terms of the concentration of alcohol found in the breath when breath analysis is used," is thus abundantly clear; it is, in fact, explicit. In *People* v. *Bransford* (1994) 8 Cal.4th 885, 890 [35 Cal.Rptr.2d 613, 884 P.2d 70], the Supreme Court stated that there is only one reasonable manner in which to read the 1990 amendment, and that is that "the Legislature intended the statute to criminalize the act of driving either with the specified blood-alcohol level or with the specified breath-alcohol level."

Consequently, the trial court did not err in holding that evidence of the inaccuracy of the 2,100:1 partition ratio, when applied to defendant under the section 23152, subdivision (b) count, was irrelevant.

Apart from being irrelevant in the sense of being unnecessary under the current legislative scheme, the proffered evidence is also irrelevant in another respect. Defendant's postarrest breath test, which showed alcohol

concentrations of .11 percent and .10 percent, was taken approximately six hours after consumption of the first beer, three hours after consumption of the second and third beers, and one to one and a half hours after consumption of the third beer. The test was therefore taken after most of the alcohol, if not all, had been fully absorbed into defendant's bloodstream. Gigiere had testified that, in the case of beer, alcohol absorption reaches its peak from "30 to 180 minutes, 73 minutes average on a [*sic*] empty stomach. Food would make it longer."

On the other hand, the breath test performed by Gigiere on November 24, showing defendant's partition ratio at 1329:1, was conducted 20 minutes after the measured consumption of alcohol under controlled conditions. It is evident that defendant's physiological condition at the time Gigiere administered his breath test is not comparable to defendant's physiological condition at the time Wowak administered the postarrest breath test. Because, as Gigiere testified, a person's partition ratio is "germane to the moment that you test," defendant's partition ratio at the time of Gigiere's test was irrelevant to establish defendant's partition ratio at the time of his arrest.

### Due Process

 Defendant contends next that to prevent him from adducing evidence of the variability between blood- and breath-alcohol measurements is to prevent him from challenging the accuracy of the breath test, and that would be a violation of his state and federal rights to due process and to confront adverse witnesses. We disagree.

In arguing due process, defendant cites a number of reasons why breath tests are inaccurate predictors of true alcohol content, among them: "the phase of alcohol absorption, body temperature, the condensation effect, the physiology of human lungs, breathing technique, the blood hematocrit, and residual mouth alcohol." Defendant claims that "[c]ertainly, due process must afford the accused the right to adduce evidence that his or her *own* blood:breath partition ratio is significantly lower than the assumed 1:2100, particularly if it, combined with other evidence, establishes that his or her alcohol content was below .08 percent."

The flaw in this argument is the assumption that the 1990 amendment requires the alcohol content in the breath to be quantitatively equivalent to the .08 percent alcohol content in the blood. As discussed, there is no such requirement. The statutory scheme under the 1990 amendment is for the blood-alcohol ratio to apply when blood test is used, and for the breath-alcohol ratio to apply when breath test is used, regardless of their conversion values.

When the Legislature enacted the 1990 amendment, it was aware of the "complexities" of converting breath-alcohol values to blood-alcohol values. Indeed, it was precisely because of those complexities that the Legislature decided to eliminate the conversion requirement, accepting as sufficient for defining legislative policy a prohibition on driving based on the presence in a person's breath of a certain amount of alcohol.

■ The Legislature's power to regulate driving is beyond constitutional challenge. "[T]he area of driving is particularly appropriate for extensive legislative regulation, and . . . the state's traditionally broad police power authority to enact any measure which reasonably relates to public health or safety operates with full force in this domain." (*Hernandez* v. *Department of Motor Vehicles* (1981) 30 Cal.3d 70, 74 [177 Cal.Rptr. 566, 634 P.2d 917].) "Surely, the regulation of drinking drivers in a state that experienced 338,344 arrests for 'drunk driving' in 1982 is well within the legitimate police power of the Legislature." (*Burg* v. *Municipal Court, supra* 35 Cal.3d at p. 267, fn. omitted.)

The fact that the current state of scientific knowledge has not settled the ongoing scientific debate as to the best method of measuring inebriation does not preclude the Legislature from regulating driving based on conflicting scientific theories. It has been held that "where scientific opinions conflict on a particular point, the Legislature is free to adopt the opinion it chooses, and the court will not substitute its judgment for that of the Legislature. [Citation.]" (*State* v. *Brayman* (1988) 110 Wn.2d 183, 193 [751 P.2d 294, 300].) Courts "cannot[] arbitrate scientific disputes." (*People* v. *Lepine, supra*, 215 Cal.App.3d at p. 100.)

Although the reliability of breath tests has been questioned by some experts, other experts have endorsed such tests as the more reliable measure of the amount of alcohol affecting the brain. As discussed by a New Jersey court in *State* v. *Downie* (1990) 117 N.J. 450 [569 A.2d 242, 250 (90 A.L.R.4th 135): "In light of the scientific and legislative evidence, we find unpersuasive the argument that blood should be the sure and ultimate measure of inebriation. Blood, itself is not monolithic. Venous blood differs from the arterial blood, which actually takes alcohol to the brain. Venous blood may be far less accurate as an indication of the amount of alcohol affecting the brain than breath in the absorptive phase. Given the fact that the legislature desired to bar driving while intoxicated, it appears logical that the blood contemplated was the arterial blood, which takes alcohol to the brain. Because arterial blood is practically unobtainable, then breath, not venous blood, is the most consistently accurate reflection of the concentration of alcohol affecting the brain. Thus, the legislative and judicial reference to 'blood' is not an intended concession that blood tests are the preferred method for ascertaining inebriation." (Fn. omitted.)

Indeed, the experts cited in the hearing notes of California's Assembly Public Safety Committee, Senate Rules Committee, and Senate Judiciary Committee, recommended that blood tests as a method of measuring inebriation be abandoned in favor of breath tests. However, instead of abandoning the blood test in favor of the breath test, the Legislature decided to adopt both tests and to allow their use on an alternative basis.

■ Whether the course chosen by the Legislature is sound is not for the courts to review. "The wisdom of the legislation is not at issue in analyzing its constitutionality, and neither the availability of less drastic remedial alternatives nor the legislative failure to solve all related ills at once will invalidate a statute. [Citations.]" (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398 [149 Cal.Rptr. 375, 584 P.2d 512].)

■ In *Burg* v. *Municipal Court, supra*, 35 Cal.3d at page 269, the court held that the 1981 version of section 23152, subdivision (b), met the due process requirement of being "definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt." Because the 1990 amendment is similar to the 1981 version for purposes of due process analysis, we must likewise reject defendant's present due process challenge.

There is, however, a kind of due process challenge that was not foreclosed by *Burg*. Defendant is not precluded from questioning the reliability of the instrument used or the procedure followed. (*People* v. *Bransford, supra*, 8 Cal.4th at p. 893.)

In this case, however, the People presented evidence to show that the breath analyzer used was operating properly, that Wowak was qualified to administer the test, and that Wowak followed prescribed procedures. Defendant interposed no challenge to this evidence. Defendant cannot therefore complain that his due process rights were violated in this respect.

### Mandatory Presumption

■ Defendant contends that unless defendants are permitted to challenge the blood:breath partition ratio, the 1990 amendment creates an irrebuttable, conclusive presumption that breath-alcohol levels are accurate and necessarily translate into blood-alcohol levels at a ratio of 1:2,100. Defendant argues that under the trial court's interpretation of the 1990 amendment, the trier of fact must presume an element of the offense, specifically blood-alcohol level in excess of .08 percent, from the evidentiary fact of a breath-alcohol level in excess of .08 percent.

The Supreme Court recently settled this question in *People* v. *Bransford, supra,* 8 Cal.4th 885. There it held that the 1990 amendment "did not presume that the driver was intoxicated or 'under the influence'; instead, it defined the substantive offense of driving with a specified concentration of alcohol in the body. Thus, it did not create an irrebuttable conclusive presumption." (*People* v. *Bransford, supra,* 8 Cal.4th at pp. 892-893.)

### Equal Protection

■ Defendant contends that to interpret the 1990 amendment as creating a new offense of "excessive breath-alcohol" would violate equal protection because similarly-situated individuals would be held to different standards of conduct based on the arbitrary factor of which test was given. The contention is without merit.

■ The essence of equal protection is that "persons similarly situated with respect to the legitimate purpose of the law receive like treatment." (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645].) "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner. [Citation.]" (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549], fn. omitted.)

■ Under the 1990 amendment, the persons similarly situated are drinking drivers. The amendment does not treat any member of that group differently. Any member of the group has the same right as any other member to elect a breath test or a blood test.

To demonstrate unequal protection, defendant asks us to consider two identical persons, twins, each with a true blood-alcohol concentration of .07 percent and a true breath-alcohol content of .09 percent. Defendant argues that hypothetically if one twin took a breath test and the other a blood test, the twin taking the blood test would go home while the twin taking the breath test would go to jail.

The argument is inappropriate. "The rule is well established . . . that one will not be heard to attack a statute on grounds that are not shown to be applicable to himself and that a court will not consider every conceivable situation which might arise under the language of the statute and will not consider the question of constitutionality with reference to hypothetical situations. [Citations.]" (*In re Cregler* (1961) 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305].)

Moreover, so long as persons in the same group are not discriminated against in the choice of tests to take, there is no denial of equal protection. " 'The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection *unless there is shown to be present in it an element of intentional or purposeful discrimination.'* . . ." (*Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 297 [124 Cal.Rptr. 204, 540 P.2d 44], citation omitted.)

As stated in *People* v. *Enriquez* (1977) 19 Cal.3d 221, 229 [137 Cal.Rptr. 171, 561 P.2d 261]: "The equal protection clause does not assure defendant of the same treatment as all other felons; it assures him only . . . that he will receive like treatment with all other persons similarly situated." "[I]t is not a denial of equal protection that one guilty person is prosecuted while others equally guilty are not. [Citations.]" (*People* v. *Tallagua* (1985) 174 Cal.App.3d 145, 150 [219 Cal.Rptr. 754].)

We conclude the 1990 amendment does not violate the state and federal equal protection clauses.

## DISPOSITION

The judgment is affirmed.

Cottle, P. J., and Elia, J., concurred.

A petition for a rehearing was denied April 26, 1995, and appellant's petition for review by the Supreme Court was denied June 28, 1995.