[No. F034485. Fifth Dist. Nov. 6, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
MOISES ACEVEDO, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III and IV of the Discussion.

COUNSEL

Marilyn Drath, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Carlos A. Martinez and Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**VARTABEDIAN, Acting P. J.**—Moises Acevedo, defendant, was convicted in two separate jury trials of several Vehicle Code violations, including felony drunk driving offenses, as well as possession of methamphetamine and misdemeanor possession of marijuana. The fact he had suffered a prior serious felony conviction (strike) within the meaning of Penal Code section 667, subdivision (d) was found true. He appeals, raising three sentencing errors, two of which have merit. Additionally, he argues the trial court erred when it prevented his counsel from cross-examining the criminalist about the partition ratio used to convert a urine-alcohol measurement into a blood-alcohol equivalent. As we will discuss in the published portion of this opinion, the partition ratio used to convert a urine-alcohol measurement into a blood-alcohol equivalent is relevant evidence in a prosecution under Vehicle Code section 23152, and the trial court prejudicially erred when it precluded cross-examination on the subject.

### FACTS AND PROCEEDINGS

On December 27, 1997, California Highway Patrol Officer John French saw a car pass by him. He noticed the driver, defendant, was not wearing his seat belt. Defendant was driving 10 to 15 miles per hour in a 25-mile-per-hour speed limit zone. Officer French stopped the car and made contact with defendant, asking for his license, registration, and proof of insurance. French could smell a strong odor of alcohol coming from the vehicle. Defendant's eyes were red and watery and his speech was slurred. Defendant remarked that his license had been suspended. When asked if he had anything to drink, defendant replied that he had consumed three beers and had smoked marijuana.

Defendant got out of the car very slowly; he put his hands on the side of the car to balance himself when he walked. Defendant said his feet were bad. The officer administered five field sobriety tests to defendant. He passed the first test, but in French's opinion did not satisfactorily complete the other four tests.

French arrested defendant for driving under the influence; the pocket of defendant's jacket contained marijuana and methamphetamine. Defendant was transported to Doctors Medical Center, where he gave a urine sample for testing.

Richard Lynd, a criminalist, tested the urine sample. He calculated defendant's blood-alcohol level from the urine to be .10 percent. It was Lynd's opinion that anyone with a blood-alcohol level of .10 percent or above is under the influence.

Based on the above evidence, defendant was convicted in superior court case No. 146157 of possession of methamphetamine, felony driving under the influence,[1] felony driving with a blood-alcohol level of .08 percent or above, and misdemeanor possession of marijuana.

On November 8, 1998, Officer Rodney Dutcher stopped defendant for speeding and weaving. After speaking to defendant, observing him, and administering a sobriety test, Officer Dutcher arrested defendant for driving under the influence. A breath test was administered and defendant's blood-alcohol level was calculated to be .11 percent.

---

[1] In a separate proceeding, the court found that defendant had suffered three prior separate violations of Vehicle Code section 23152 within seven years, thus elevating defendant's current driving offenses to felonies. In addition, the court found that defendant had suffered a prior serious felony conviction, or strike.

Defendant was convicted in superior court case No. 199510 of felony driving under the influence and felony driving with a .08 percent or more blood-alcohol level.[2]

On October 1, 1999, defendant was sentenced for the convictions arising from the two separate proceedings. Prior to sentencing, defendant filed a motion to strike his prior serious felony conviction pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628]. The trial court refused to strike defendant's prior serious felony conviction, finding the request to strike completely inappropriate and finding it would not be in furtherance of justice to strike the prior conviction. On count I, possession of methamphetamine (Health & Saf. Code, § 11377), case No. 146157, the court imposed the midterm of two years, doubled to four due to the strike. The court imposed a concurrent term of two years for count II, driving under the influence (Veh. Code, § 23152, subd. (a)), and a concurrent two-year term for count III, driving with a .08 percent or above blood-alcohol level (Veh. Code, § 23152, subd. (b)). In case No. 199510 the court sentenced defendant on count I, driving under the influence, to the midterm of two years, doubled to four years because of the strike, plus an additional two-year consecutive term for the on-bail enhancement (Pen. Code, § 12022.1). The court ordered a concurrent six-year term for count II, driving with a .08 percent or above blood-alcohol level. The court ordered this six-year term to run fully consecutive to the four-year term in case No. 146157, for a total term of 10 years.

DISCUSSION

I.

*Relevancy of Urine-alcohol Partition Ratio*

Beginning in 1913, California prohibited an intoxicated person from driving a motor vehicle upon any public highway. (Stats. 1913, ch. 326, § 17, p. 646.) Recognizing that this definition was difficult to apply, in 1969 the Legislature created a presumption that a driver was under the influence if the driver had a .10 percent or more by weight of alcohol in his or her blood. (*Burg v. Municipal Court* (1983) 35 Cal.3d 257, 262-263 [198 Cal.Rptr. 145, 673 P.2d 732].) Although the 1969 law aided the prosecution, it still proved difficult to apply because the question was defined in terms of the defendant's subjective behavior and condition; "a defendant could escape conviction merely by raising a doubt as to his intoxication." (*Id.* at p. 263.) "In an

---

[2]Again the court found defendant's prior convictions to be true. In addition the court found an on-bail enhancement to be true.

attempt to address the continuing threat to public safety posed by drinking drivers, in 1981 the Legislature retained the 'driving under the influence' statute, renumbered it [Vehicle Code] section 23152, subdivision (a), and added . . . section 23152, subdivision (b) which provide[d]: 'It is unlawful for any person who has 0.10 percent or more, by weight, of alcohol in his or her blood to drive a vehicle. [¶] For purposes of this subdivision, percent, by weight, of alcohol shall be based upon grams of alcohol per 100 milliliters of blood.' " (*Id.* at p. 264.)

The *Burg* "court held that section 23152, subdivision (b), established a new and separate offense. More significantly, the court held that under the subdivision (b) scheme, it was no longer necessary to prove that the defendant was in fact under the influence; it was enough to prove that the defendant's blood-alcohol level was 0.10 percent or more." (*People v. Ireland* (1995) 33 Cal.App.4th 680, 689 [39 Cal.Rptr.2d 870].) In 1989, the blood-alcohol level for a violation of Vehicle Code section 23152, subdivision (b) was lowered from .10 percent to .08 percent. (Stats. 1989, ch. 1114, § 27, p. 4040.)

"However, because the proscribed driving was still based on the amount of alcohol present in the person's blood, it was necessary, in the case of defendants who elected urine or breath tests, to convert the alcohol readings in those tests to their corresponding blood-alcohol readings." (*People v. Ireland, supra,* 33 Cal.App.4th at p. 689.) The guidelines used to convert the readings are set forth in title 17, California Code of Regulations, section 1220.4 (the partition or conversion ratio).

Because breath- and urine-alcohol tests had to be converted to blood-alcohol readings, defendants mounted attacks on the reliability of the partition ratio. In *People v. Lepine* (1989) 215 Cal.App.3d 91 [263 Cal.Rptr. 543], Lepine was charged with driving with a 0.10 percent blood-alcohol content. She submitted to a breath test. Her breath sample was converted to a blood-alcohol percentage of 0.13 based on the conversion formula set forth in title 17 of the California Code of Regulations, section 1220.4, subdivision (f). Before trial she stated her intention of challenging the ratio contained in the regulations that was used to convert her breath-alcohol percentage to its blood-alcohol equivalent. She sought to do so by cross-examining the prosecution expert and by presenting the testimony of a forensic scientist. The People objected and "argued that to allow a general attack, unrelated to a defendant's actual ratio at the time the breath sample was taken, was irrelevant, speculative and potentially confusing." (*People v. Lepine, supra,* 215 Cal.App.3d at p. 94.) The defense offered a transcript of testimony from an expert in another case, which described variables in the partition ratios in the general population. The municipal court sustained the People's objection

and refused to allow introduction of defense evidence concerning general variability in the partition ratio and refused to allow cross-examination of the People's expert on the subject. (*Id.* at pp. 94-95.)

The appellate court[3] rejected the People's position that general evidence of partition ratio variability is speculative, would confuse the jury, and would prejudice the People. The appellate court stated: "What the People seek, however, is not escape from an unfair disadvantage, but the perpetuation of an unfair advantage. While we will not, and cannot, arbitrate scientific disputes, it seems clear from the evidence submitted in this case and from a host of opinions in this and other states, that the partition ratio may vary from time to time and from individual to individual. This being the case it is appropriate a jury be allowed to consider that fact. We trust in the general rules of evidence, the preparation of counsel and the good judgment of trial judges to insure that this question of partition ratio variability is presented to jurors in a proper, complete and understandable form." (*People v. Lepine, supra,* 215 Cal.App.3d at p. 100.)

The court reversed the judgment, concluding that "the trial court erred in excluding the defense from cross-examining the People's expert concerning partition ratio variability and from presenting evidence concerning such variability." (*People v. Lepine, supra,* 215 Cal.App.3d at p. 101.)

"The need for the prosecution to prove that breath-test readings met the .08 percent requirement when converted to blood-alcohol readings did not promote the legislative scheme. The Assembly Committee on Public Safety, the Senate Rules Committee, and the Senate Committee on Judiciary all decried that the challenges to the accuracy of the partition ratio had resulted in 'expensive and time consuming evidentiary hearings and undermine[d] successful enforcement of driving under the influence laws.' [Citation.]" (*People v. Ireland, supra,* 33 Cal.App.4th at pp. 689-690.) Once again, in 1990, the Legislature changed the law; it amended Vehicle Code section 23152, subdivision (b) to read: "It is unlawful for any person who has 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle. [¶] For purposes of this subdivision, percent, by weight, of alcohol in a person's blood shall be based upon grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath." (Stats. 1990, ch. 708, § 1, p. 3289.)

The California Supreme Court in *People v. Bransford* (1994) 8 Cal.4th 885 [35 Cal.Rptr.2d 613, 884 P.2d 70] interpreted the 1990 version of Vehicle

---

[3]The appellate department of the superior court reversed and the matter was transferred to the Court of Appeal pursuant to Code of Civil Procedure section 911.

Code section 23152, subdivision (b). The court evaluated "whether the trial court should have allowed defendants convicted of driving with 0.08 percent or more of alcohol in their blood to challenge their breath-test results by showing that their personal ratio of breath-alcohol concentration to blood-alcohol concentration (the 'partition ratio') differed from the standard partition ratio that breath-testing machines use to convert breath-alcohol readings into blood-alcohol equivalents." (*People v. Bransford, supra,* 8 Cal.4th at pp. 887-888.) The defendants argued that the amendment of Vehicle Code section 23152, subdivision (b) made no substantive change in the prior statute but merely codified the existing administration definition of the standard partition ratio contained in the California Code of Regulations. The Supreme Court disagreed and found that, as amended, "the Legislature intended the statute to criminalize the act of driving either with the specified blood-alcohol level or with the specified breath-alcohol level. The second paragraph provided two distinct definitions." (*People v. Bransford, supra,* 8 Cal.4th at p. 890.)

Because the statute defined the offense on the basis of grams of alcohol per 210 liters of breath, the Supreme Court held the trial court correctly ruled that the defendant's proffered evidence of the partition ratio was irrelevant and therefore inadmissible. (*People v. Bransford, supra,* 8 Cal.4th at p. 893.)

Defendant here took a urine test. The prosecution's expert determined defendant's blood-alcohol content by using the partition ratio for alcohol in urine in title 17 California Code of Regulations, section 1220.4, subdivision (e). It provides: "A urine alcohol concentration shall be converted to an equivalent blood alcohol concentration by a calculation based on the relationship: the amount of alcohol in 1.3 milliliters of blood is equivalent to the amount of alcohol in 1 milliliter of urine." Defendant attempted to cross-examine the expert on the variability of individual partition ratios used to convert urine-alcohol concentrations to blood-alcohol concentrations. The trial court repeatedly precluded all questioning in this area.

Defendant contends that the failure of the trial judge to allow defense counsel to question the prosecution expert regarding the reliability of the urine test constituted a violation of defendant's constitutional right of cross-examination and denied him the right to a fair trial. Defendant relies on *People v. Lepine, supra,* 215 Cal.App.3d 91 to support his position. Defendant claims that the error was prejudicial and his conviction for driving under the influence (Veh. Code, § 23152, subd. (a)) and his conviction for driving with a 0.08 percent blood-alcohol level (Veh. Code, § 23152, subd. (b)) should be reversed.

Respondent claims that the trial court properly limited cross-examination regarding the partition ratio used to convert a urine-alcohol measurement

into its blood-alcohol equivalent. Respondent contends that the *Bransford* case applies and in light of *Bransford, Lepine* is no longer good law. In any event, respondent submits that the error, if any, was harmless beyond a reasonable doubt, "at least as to count II [(Veh. Code, § 23152, subd. (a))]."

Respondent fails to explain how the *Bransford* holding applies to the situation here. Vehicle Code section 23152, subdivision (b) makes it a crime to drive with a certain blood-alcohol level or breath-alcohol level. The statute does not make it a crime to drive with a certain urine-alcohol level. When the urine test is administered, the results must be converted to a blood-alcohol level using the partition ratios set forth in the California Code of Regulations. *Bransford* simply has no application to urine partition ratios. The court in *Bransford* explained why, prior to the amendment of the statute, courts allowed defendants to challenge results of their breath tests on the basis of variable partition ratios.

"Many variables, however, can affect the actual ratio of an individual's breath-alcohol concentration to blood-alcohol concentration. These variables include body temperature, atmospheric pressure, medical conditions, sex, and the precision of the ·measuring device. [Citations.] Changes in these variables may result in a difference between an individual's actual blood-alcohol level and the blood-alcohol level determined by applying the standard partition ratio to the breath-test results.

"Courts therefore allowed defendants charged under the predecessor statute to attack breath-test results on the basis of this variability. Defendants were initially allowed to demonstrate only that their personal partition ratio differed from the standard partition ratio. [Citations.] They would do so by simultaneously measuring their breath-alcohol concentration and blood-alcohol concentration over a period of time. [Citations.] Later courts also allowed defendants to demonstrate that partition ratios differ among individuals generally. [Citation.] Defendants would usually do so by having an expert testify that the standard partition ratio is merely an approximation and that different individuals have different personal partition ratios. [Citations.]" (*People v. Bransford, supra,* 8 Cal.4th at p. 889.)

The court in *Bransford* did not disapprove of the above line of cases; it merely found they were no longer applicable when the defendant was charged with a violation of Vehicle Code section 23152, subdivision (b) and sought to challenge the partition ratios for breath tests. Because the statute now defined the crime in terms of specific grams of alcohol per liter of breath, partition ratios comparing volume of blood to volume of breath no

longer bore relevance. Contrary to respondent's assertion, *Bransford* does not apply to urine partition ratios; *Lepine* applies.[4]

■ "The Sixth Amendment guarantees the right of an accused in a criminal prosecution ' "to be confronted with the witnesses against him." ' [Citation.] 'The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings [citation] "means more than being allowed to confront the witness physically." [Citation.] Indeed, " '[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*' " [Citations.]' [Citation.] '[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, . . . to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.' [Citation.]" (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1137 [99 Cal.Rptr.2d 149, 5 P.3d 203].)

"It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. [Citations.] To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial." (*Alford v. United States* (1931) 282 U.S. 687, 692 [51 S.Ct. 218, 219, 75 L.Ed. 624].)

■ The trial court erred when it limited defendant's cross-examination of the prosecution expert, Lynd, sustaining all objections to questions relating to challenging the partition ratio used by the expert. Respondent asserts the error, if any, was harmless at least as to the Vehicle Code section 23152, subdivision (a) count.

We set forth in detail a close review of the record to demonstrate that the error was prejudicial as to both Vehicle Code convictions: driving under the

---

[4]Respondent does not claim that partition ratios for urine testing are consistently the same from one individual to another. At the conclusion of an article in the Journal of Forensic Science, after analyzing the value of urine tests for determining an equivalent blood-alcohol concentration, the authors recommended that "A U/B [urine-blood] conversion ratio of 1.3:1 should be routinely applied to all urine samples in determining an equivalent BAC [blood-alcohol concentration]: however, for purpose of legal argument, it should be conceded that a reasonable potential variation up to 1.5:1 could apply in some cases." (Biasotti & Valentine, *Blood Alcohol Concentration Determined from Urine Samples as a Practical Equivalent or Alternative to Blood and Breath Alcohol Tests* (1985) 30 J. Forensic Sci. 194, 206.)

influence (Veh. Code, § 23152, subd. (a)) and driving with a blood-alcohol level of .08 percent or above (Veh. Code, § 23152, subd (b)).

Lynd testified that he was familiar with the effect of alcohol upon a person's ability to drive safely. He stated, "I think everybody is an impaired driver with a blood alcohol of .10 percent or higher. Most people are going to be impaired at a level less than that." He supported his conclusion by describing certain studies done on a driver's impairment at different levels of intoxication, again emphasizing the .10 percent level as the level where drivers are always under the influence, in his opinion.

Lynd then described the procedures used in the laboratory to test alcohol in a urine sample. He then testified about how he tested defendant's urine sample. The tests resulted in a conclusion that defendant's blood-alcohol level at the time of the urine sample was .10 percent. He further testified that based solely on defendant's .10 percent blood-alcohol level "I could say he wouldn't be able to drive a car safely with this blood alcohol level" and defendant would be under the influence.

The prosecutor described several of the observations of defendant by Officer French to the expert and asked if those were consistent with a person being under the influence of intoxicating liquor. Lynd replied that they were consistent. Lynd testified that if defendant had reached his peak blood-alcohol level and was on a "downhill," his blood-alcohol level at the time he was stopped would be in the neighborhood of .13 or .14 percent. This was only accurate if the assumption that defendant had reached his peak was true. Lynd testified that if these higher figures were in fact defendant's level at the time he was driving "that would certainly be consistent with him being under the influence of alcohol."

On cross-examination, Lynd testified that a formula was used to determine the blood-alcohol level from urine. Lynd agreed there are people who would argue that urinalysis is not the best method of determining blood-alcohol concentration. The court sustained the prosecution's relevance objection to questions regarding the universal acceptance of the conversion ratio for breath to blood and the fact that about half the states do not recognize urinalysis as a legitimate means of obtaining the blood-alcohol concentration. An objection was sustained to the question of whether Lynd had kept abreast of any studies regarding the strength of the analysis he utilized in testing the urine. The court sustained an objection from defendant's counsel of whether Lynd was aware that law enforcement officers no longer have to

offer a choice of urinalysis.[5] Defense counsel then began questioning Lynd regarding the assumptions that have to be made in order to use urinalysis to convert the results back to blood-alcohol concentration. Lynd replied "We don't have to because we work under some rules that are found in Title 17 of the California Code of Regulations, and they tell me I have to divide how much alcohol I found in the urine by 1.3. That doesn't give me any choice. It's not a concern." Defense counsel asked, "And you have to assume that the ratio of alcohol in the blood to that in the fluid is relatively constant over the whole general population of California." Again the prosecution's objection was sustained. Counsel questioned whether different states use different models. Lynd said he was not aware of that. The court sustained an objection as to Lynd's awareness as to the ratio used in other states. Next the court sustained an objection to counsel's question whether the 1.3 ratio assumes that everyone in that particular state has the same urine-to-blood ratio. Immediately thereafter, the court sustained an objection to counsel's question regarding different biological makeups from person to person.

Apparently frustrated with counsel's persistence in this area, the court interjected and the following occurred:

"THE COURT: You can challenge the individual test in this case, but the method of testing, that's the law in the State of California, three methods of testing. If you want to change that, go to the legislature.

"MR. LOPEZ [defense counsel]: There are assumptions, though, that he is making in order to make this test.

"THE COURT: The law tells him he has to make those assumptions, right? It's in Title 17.

"Is that what it is?

"THE WITNESS: Yes, Your Honor.

"THE COURT: Not here to litigate whether those rules are good or bad.

"MR. LOPEZ: California uses the .13 [sic] ratio.

"Ms. VAUGHN [district attorney]: Same objection.

---

[5]At the time of defendant's arrest, a person stopped on suspicion of being under the influence was given the choice of a blood, breath, or urine test. (Veh. Code, former § 23157.) Presently, an individual is given the option of chemical testing of blood or breath. If both blood and breath tests are unavailable, then the person must submit to a urine test. A blood or urine test is required if the officer believes the person was driving under the influence of any drug or the combined influence of an alcoholic beverage and any drug. (Veh. Code, § 23612.)

"The Court: Sustained.

"Mr. Lopez: Q. So when you first test—you first get a result of what the urine alcoholic concentration is, right?

"A. Actually, no. The way it works is, when we prepare the samples for the gas chromatograph, I tell the instrument whether it's a blood or a urine sample. If I tell it it's a urine, it automatically divides by this 1.3 ratio. I don't have to do anything extra.

"Q. So you don't know what it was at, urine alcoholic concentration, you don't know what that level was?

"A. Oh, sure.

"Q. What was it?

"A. It was 1.3 times the results the instruments gave me.

"Q. Do people vary in the level—scratch that, Your Honor.

"Is it true that the reason 1.3 was used, 1.3 to one ratio used—

"Ms. Vaughn: I am going to object to any further questions about the ratio.

"The Court: Sustained.

"Mr. Lopez: Q. Does everybody have that ratio?

"Ms. Vaughn: Objection.

"The Court: Sustained."

Defendant was allowed to ask Lynd if someone's blood-alcohol content would be different if his or her ratio was 1.5 instead of 1.3. Lynd said yes, the blood-alcohol content would be lower. The court continued to sustain objections to defense counsel's questions regarding differing ratios.

The prosecutor began her redirect of the expert by asking him if the testing machine in the laboratory was set to California legal standards. Lynd replied it was. The district attorney continued: "That's accepted . . . as reliable scientific evidence throughout the State of California; isn't that true?" Lynd replied it was.

In closing argument to the jury, the district attorney argued that defendant drove under the influence and drove with a .08 percent or above blood-alcohol level. In making this determination, the district attorney argued that the jury should consider that defendant's urine tested .10 percent, "tested according to California laws, California standards."

During defense counsel's closing argument, he stated to the jury that Lynd's estimate of defendant's blood-alcohol level was wrong and he would tell the jury why the estimate was wrong. The following occurred:

"You have heard—you heard Dr. Lynd testify that urinalysis is still in serious debate in California. There are many experts who disagree with him. Many experts—

"THE COURT: You asked those questions. I sustained the objection.

"MS. VAUGHN: This is not the law.

"MR. LOPEZ: No, I asked him—

"THE COURT: Don't argue with me. That wasn't objected to. There is a debate. There was a debate in the community."

The district attorney in her final argument emphasized that it was important for the jury to remember that questions are not evidence and if a question was objected to and the objection sustained, then it is not even on the record. Regarding the ratio questions and the validity of Lynd's testimony the prosecutor argued:

"Additionally, all the questions regarding the urine test and supposed ratios, all of that is not evidence because the law in California says that the drug laboratory, the Department of Justice, is to use a certain standard in doing their urine tests.

"In fact, the law in California says you get to choose a urine test if that's your choice. If you choose a urine test, you can't come in here and say, well, urine tests are bad across the board because that was his choice. He chose that.

"And it is important to remember that the law is the urine test is valid and the procedure with which Dr. Lynd said they use is the California legal procedure. That's what the law says they have to do. They do it as they are told to do it. There is no disputing that. There is no evidence to the contrary.

You didn't hear anybody get up here and say that test didn't work. Was the machine not working properly? The only evidence you have is that it was working properly.

"They have—and Dr. Lynd told you we have tests. We have samples in there that we know are .0. We have controls set up to make sure that it's working right. And they take two samples out of the urine and run them through the machine. That's how they got these results. He told you that. It's in the testimony. Only what he said is evidence.

"That is very important for you to remember, because counsel just sat here and went on and on about Count III, saying there is no evidence to support it. Well, I told you in my opening—closing argument that we're not here to prove he was drunk, we are not to prove he was falling down, that he weaved all over the road. That's not what we have to prove. There is no element there that says that. Weaved. All we have to do is show he was under the influence of the alcohol.

"Dr. Lynd said you're impaired. What does that mean? Dr. Lynd said there is such a thing as tolerance. There is no evidence as to what the history of this man's drinking is. We don't know what his tolerance is. But we know from what Dr. Lynd said, what is in evidence, is that everybody at .10 is impaired. How much impaired? It doesn't matter. They are impaired. They are impaired to the point that they are not going to make the same decisions or react the same way that a normal person who has no alcohol in their system or under that amount would do."

Defendant was precluded from asking questions regarding partition ratios. As stated in *People v. Lepine, supra,* 215 Cal.App.3d at page 100, the jury should be allowed to consider that partition ratios may vary from time to time and from individual to individual. Not only was the jury here precluded from hearing all evidence related to this variability, but the court, the prosecutor, and Lynd separately emphasized that the partition ratio used by Lynd is the ratio mandated by the State of California, and the prosecutor went so far as to elicit from Lynd that the ratio is "accepted . . . as reliable scientific evidence throughout the State of California." After hearing from several sources, including the judge, that the ratios are mandated in California, the jury was clearly led to believe that the partition ratios were cast in stone with no variations allowed. Defendant was not allowed to attempt to establish that the partition ratio used by the expert might not be accurate for all individuals. Defendant's blood-alcohol level was calculated to be .10 percent, this is not appreciably higher than the .08 percent required to prove a violation of Vehicle Code section 23152, subdivision (b). Defendant was clearly prejudiced as to the subdivision (b) count.

He was also prejudiced as to the driving under the influence count (Veh. Code, § 23152, subd. (a)). Although Officer French provided significant evidence that defendant was driving under the influence, the evidence was not overwhelming, and defendant offered plausible explanations for his failure to pass some of the sobriety tests conducted by French. Lynd repeatedly stated that anyone driving with a .10 percent or above blood-alcohol level was under the influence. The prosecutor during her closing argument emphasized this. In addition, the trial court, Lynd, and the prosecutor fortified the ratio used in Lynd's .10 percent calculation as sacrosanct in California, thus giving it a false aura of absolute reliability. During deliberations the jury asked to hear the testimony of both Officer French and Lynd. The jury may very well have used Lynd's .10 percent calculation and testimony that anyone with a .10 percent or above blood-alcohol level is under the influence in determining that defendant was guilty of driving under the influence pursuant to Vehicle Code section 23152, subdivision (a). The failure to allow cross-examination on the partition ratio prejudiced defendant for this count also. Counts II and III of case No. 146157 must be reversed.

### II.-IV.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The convictions of count II (Veh. Code, § 23152, subd. (a)) and count III (Veh. Code, § 23152, subd (b)) in case No. 146157 are reversed. After further proceedings are concluded on the reversed counts in case No. 146157, the trial court must resentence defendant in accordance with the views expressed above. In all other respects, the judgment is affirmed.

Harris, J., and Wiseman, J., concurred.

---

*See footnote, *ante,* on page 757.